Robert STROUGO, on behalf of The
BRAZIL FUND, INC., Plaintiff,

v.

SCUDDER, STEVENS & CLARK,
INC., Defendant,

and

The Brazil Fund, Inc., Nominal
Defendant.

Robert STROUGO, on behalf of himself
and all others similarly situated,
Plaintiff,

v.

Juris PADEGS, Nicholas Bratt, Edgar R.
Fiedler, Roberto Teixeira Da Costs, Ronaldo A. Da Frota Nogueira, Wilson Nolen, Edmond D. Villani, and Scudder,
Stevens & Clark, Inc., Defendants.

No. 96 Civ. 2136 (RWS).

United States District Court,
S.D. New York.

May 6, 1997.

Wechsler Harwood Halebian & Feffer by Joel C. Feffer, Jeffrey M. Haber, Richard B. Brualdi, of counsel, New York City, for Plaintiff.

Debevoise & Plimpton by John S. Kiernan, Jeremy Feigelson, Edward V. Di Lello, of counsel, New York City, for Defendants.

Dechert, Price & Rhoads by Bernard J. Bonn, III, of counsel, Boston, MA, for Nominal Defendant The Brazil Fund.

Ropes & Gray by John D. Donovan, Jr., Timothy J. Hinkle, Silvestre A. Fontes, of counsel, Boston, MA, for Independent Directors of The Brazil Fund One International Place.

SWEET, District Judge.

In this action alleging violations of the Investment Company Act of 1940, as amended (the "ICA"), 15 U.S.C. §§ 80a–1 et. seq., and breach of fiduciary duty under the common law, defendants Scudder, Stevens & Clark, Inc. ("Scudder"), Juris Padegs ("Padegs"), Nicholas Bratt ("Bratt"), Edmond Villani ("Villani"), Edgar Fiedler ("Fiedler"), Wilson Nolen ("Nolen"), Roberto Teixeira Da Costa ("Da Costa"), Ronaldo A. Da Frota Nogueira ("Nogueira"), and nominal defendant the Brazil Fund ("the Fund"), have moved to dismiss the complaint of Robert Strougo ("Strougo") for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to make pre-suit demand, pursuant to Fed.R.Civ.P. 23.1, and for failure to plead with particularity, pursuant to Fed.R.Civ.P. 9(b).

For the reasons set forth below, the motions will be granted in part and denied in part.

*Parties*

Strougo purchased 1,000 shares of the Fund on January 11, 1993, and has held shares continuously thereafter.

The Fund, a nominal defendant in this action, is a Maryland corporation whose principal executive office is located in New York, New York. The Fund is a non-diversified, closed-end investment company that invests in the securities of Brazilian companies. Shares in the Fund trade on the New York Stock Exchange.

Scudder is a Delaware corporation whose principal offices are located in New York, New York. Scudder serves as investment advisor to and manager of the Fund. It is a registered investment advisor under the Investment Advisers Act of 1940, as amended, 15 U.S.C. 80b–1 et seq.

Padegs is chairman of the board and a director of the Fund. He is also a managing director of Scudder and serves on both Scudder's board and the boards of other funds managed by Scudder.

Bratt is president and a director of the Fund. Bratt is also a managing director of Scudder and serves on the boards of other funds managed by Scudder.

Villani is a director of the Fund. He is also president and managing director of Scudder and serves on both Scudder's board and the boards of other funds managed by Scudder.

Scudder, Padegs, Bratt and Villani will be referred to as the "Scudder Defendants."

Fiedler is a director of the Fund and serves on the boards of seven other funds managed by Scudder. He received $30,003 in compensation for serving on boards of funds managed by Scudder and accrued $366,075 in deferred compensation for service on two Scudder funds.

Nolen is a director of the Fund. He also serves on the boards of fourteen other funds managed by Scudder. Nolen's aggregate compensation for service on these boards was $132,023 in 1994.

Nogueira is a director and resident Brazilian director of the Fund. He serves on the boards of three other funds managed by Scudder. Nogueira's aggregate compensation for serving on these boards was $54,997 in 1994.

Da Costa is a director and resident Brazilian director of the Fund. Da Costa was compensated $13,868 for serving on the Fund's board in 1994.

### Prior Proceedings

Strougo filed his initial complaint on March 22, 1996. He filed the first amended class action and verified shareholder derivative complaint (the "Complaint") on June 17, 1996. Defendants filed the instant motions on July 29 and July 30, 1996. Oral argument was heard on January 15, 1997, at which time the motions were deemed fully submitted.

### The Facts

On a motion to dismiss under rule 12(b)(6), the facts alleged in the complaint are presumed to be true, and all factual inferences are drawn in the plaintiff's favor. *Mills v. Polar Molecular Corporation*, 12 F.3d 1170, 1174 (2d Cir.1993). Accordingly, the facts presented here are drawn from the allegations of the Complaint and do not constitute findings of fact by the Court.

This action arises from the 1995 decision by the board of directors of the Brazil Fund, a closed-end investment company incorporated under Maryland law and traded on the New York Stock Exchange, to increase the Fund's capital by offering the Fund's existing shareholders rights to purchase additional shares of newly issued stock (the "Rights Offering"). Strougo asserts that Scudder and each of the directors of the Fund breached their respective fiduciary duties of loyalty and due care as a result of the development and implementation of the Rights Offering.

Scudder created the Brazil Fund in 1988. The Fund is a non-diversified, closed-end investment company registered under the Investment Company Act of 1940 (the "ICA") that invests almost exclusively in securities of Brazilian companies. Certain of the Fund's directors serve as executive officers of Scudder and receive substantial compensation from Scudder. A majority of the remaining directors of the Fund serve as directors of other closed-end funds affiliated with Scudder. Defendant Fiedler serves on the boards of eight funds managed by Scudder and received or accrued approximately $400,000 as a result of such directorships during 1994. Defendant Nolen serves on the boards of fifteen funds managed by Scudder and received $132,023 in 1994 as a result thereof. Defendant Nogueira serves on the boards of four funds managed by Scudder and received $54,997 in 1994 as a result thereof.

Unlike a traditional mutual fund in which investors purchase and redeem shares directly from and with the mutual fund, a closed-end fund has a fixed number of shares and (after the initial public offering) investors may only purchase shares from an existing shareholder through a stock exchange on which such shares are listed. Thus, shares in a closed-end fund are traded exactly like the shares of any other publicly-owned corporation. By contrast with an "open-end" mutual fund, in which the number of shares is not fixed and investors can purchase or redeem shares at current net asset value ("NAV") (calculated by dividing the fund's total assets by the number of shares outstanding), a closed-end fund has a fixed number of shares that originally were sold in a public offering. Per-share trading prices may be at either a premium or a discount to NAV, but more often are at a discount.

Because closed-end funds operate with a fixed number of shares, they have limited options for obtaining capital to make new investments. Once a fund's initial capital has been fully invested, new investments generally can be made only if the fund sells existing portfolio holdings. Other options for raising capital include secondary public offerings at net asset value, or rights offerings to current investors at or below NAV.

Scudder is paid a fee equal to a percentage of the Fund's net assets. From December 1994 through November 1995, the Fund's net assets declined significantly, dropping to $271 million on November 16, 1995, from $377 million on December 31, 1994. As the Fund's net assets materially declined, so did Scudder's fee.

As a result of the decline in net assets, as well as in Scudder's fees, Strougo alleges that defendants decided to raise additional capital to increase the Fund's net assets, and thereby restore Scudder's annual compensation. On October 13, 1995, defendants announced that the Fund would conduct the Rights Offering, whereby the Fund would issue transferable rights to its shareholders. Each Fund shareholder received one right for each share held; three rights entitled the holder to purchase an additional share at the "Subscription Price" of $15.75. The rights were transferrable; that is, if the shareholders did not wish to exercise their rights to purchase additional shares, they were entitled to sell the rights to any purchaser. The rights expired on December 15, 1995.

The Subscription Price was 30.19% below the Fund's NAV and resulted in per share NAV being reduced by $1.88. This $1.88 per share dilution was accompanied by a contemporaneous decline in the market price of the Fund's shares. The price of the Fund's stock declined, dropping $2.125 per share from $25.125 the day before the Rights Offering was announced to $23.25 one week later. Strougo alleges that as a result of the "coercive" Rights Offering, plaintiff and the other shareholders of the Fund, as well as the Fund itself, suffered harm in the form of market and dilution damages. The Complaint alleges that Rights Offerings "cause a loss to existing shareholders" because they "dilute the *pro rata* holdings of ... stock held by the fund allocable to existing shares [, and] because investment banking fees and other transactional costs are incurred by the closed-end fund." Moreover, Strougo alleges that the market value of the Fund's shares was depressed below what it would have been had the Rights Offering not been made.

The Complaint alleges six separate claims. Claim I, which is brought derivatively pursuant to ICA Section 36(b) on behalf of the Fund and against Scudder only, seeks the recovery of excessive fees. Claims V and VI, also brought derivatively on behalf of the Fund, but pursuant to Fed.R.Civ.P. 23.1, and against all defendants except the fund, allege breaches of fiduciary duty owed to the Fund. Claim V is brought pursuant to ICA Section 36(a) and Claim VI is brought pursuant to the common law.

Claims II, III, and IV are brought as direct class claims pursuant to Fed.R.Civ.P. 23, on behalf of a putative class consisting of Fund shareholders during the period October 13, 1995, to December 15, 1995. Claim II is brought against all defendants (except nominal defendant the Fund) for breaches of their ICA Section 36(a) fiduciary duties owed to the fund's shareholders. Claim IV is brought against all defendants (except nominal defendant the Fund) for breaches of their common law fiduciary duties owed to the Fund's shareholders. Claim III is brought against the Scudder defendants and alleges control person liability pursuant to ICA Section 48.

With respect to Claims V and VI, which are derivative in nature,[1] the Complaint alleges that demand would be futile for the following reasons: (1) the board participated or acquiesced in the alleged wrongful acts or intentionally or recklessly failed to inform themselves of the harms and benefits associated with the Rights Offering; (2) a majority of board members are "controlled by or financially dependent" on Scudder, by virtue of their compensation for sitting on the boards of other Scudder funds; (3) because the entire board was responsible for the wrongful acts, the directors cannot independently determine whether a suit should be brought against themselves; (4) the wrongful acts constituted a waste of the Fund's assets, which is unprotected by the business judgment rule; (5) the wrongful acts constituted violations of federal securities law and fiduciary duties, which are not protected by the business judgment rule; and (6) the Fund's directors' and officers' insurance coverage would be voided if the Fund commenced proceedings against the directors.

---

**1.** Although Claim I, for violation of Section 36(b), is "derivative," in the sense that it is brought on behalf of the corporation, demand is not required, because the shareholders are asserting a right the statute vests in the shareholders on behalf of the company, not in the company itself. *Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 527–28, 104 S.Ct. 831, 834, 78 L.Ed.2d 645 (1984).

## Discussion

### I. *Legal Standards Under Rule 12(b)(6)*

Rule 12(b)(6) imposes a substantial burden upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The court must accept a complaint's factual allegations as true, drawing all reasonable inferences in the plaintiff's favor. *Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995) (*citing Hill v. City of New York*, 45 F.3d 653, 657 (2d Cir.1995)). *See also Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 1686–87, 40 L.Ed.2d 90 (1974); *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992).

The appropriate inquiry is not "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686; *see also Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 124 (2d Cir.1991) (plaintiff is not compelled to prove his case at the pleading stage); *Russell v. Northrop Grumman Corp.*, 921 F.Supp. 143, 146 (E.D.N.Y.1996).

### II. *The Class Claims Will Be Dismissed As Derivative*

Claim II purports to assert a direct class action claim for breach of fiduciary duty pursuant to Section 36(a), while Claim IV directly asserts breach of fiduciary duty under Maryland common law. However, these claims cannot be maintained by Strougo as direct claims because they allege injury to the Fund, and any harm to Strougo is derivative in nature. Therefore, these claims may be brought only by the corporation, or on its behalf in a shareholder derivative claim.

To determine whether a claim brought under the ICA is direct or derivative, a court must look to the law of the state in which the fund was incorporated. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 97–99, 111 S.Ct. 1711, 1716–18, 114 L.Ed.2d 152 (1991) (holding that non-conflicting state law governs federal rules of decision under the ICA). As the Fund is a Maryland corporation, Maryland law governs the rules of decision. Maryland law directs courts to look to the nature of the wrongs alleged in the complaint to determine whether a complaint states a direct or an individual cause of action. James J. Hanks, Jr., *Maryland Corporation Law* § 7.21(b) (1990 & 1995–1 Suppl.) (collecting cases).

Under Maryland law,

[i]t is a general rule that an action at law to recover damages to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock.... Generally, therefore, a stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock.... Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders ..."

*Waller v. Waller*, 187 Md. 185, 189–90, 49 A.2d 449, 452 (1946).

Where the injury falls equally on all shareholders and no special relationship between the plaintiff and the defendant might create a duty other than that owed to the corporation, there is no direct cause of action in a shareholder. *Olesh v. Dreyfus Corp.*, No. CV 94–1664, 1995 WL 500491, * 7 (E.D.N.Y. Aug.8, 1995).

The Complaint here alleges an undifferentiated harm suffered by all shareholders deriving from asserted harm to the Fund. The purported class consists of:

all persons who owned shares in the Fund at any time between October 13, 1995 (the date the Fund first publicly announced the rights offering) and December 15, 1995 (the date the rights expired), and who sustained damages as a result thereby.

The charge that all shareholders were harmed in the same fashion by the same capital-raising exercise states a derivative, not a direct claim.

The assertion that plaintiffs were injured as a result of the increased transaction costs and increased management fees that the Rights Offering brought about for the Fund is, on its face, a claim that all shareholders suffered because the Fund suffered by paying costs that it should not have had to pay. This claim too, is derivative. *See Olesh,* 1995 WL 500491 at *7 (claim of injuries from increased fees derivative because fees imposed on funds, not shareholders directly).

Plaintiff's claims of dilution and of loss of share value similarly spring from a single course of conduct by the defendants toward all shareholders, which is asserted to have adversely affected the Fund's overall capitalization. These claims accordingly are derivative in nature as well, and consequently can only be brought by the Fund on behalf of all shareholders. *See, e.g., Waller,* 49 A.2d at 452 ("A cause of action for injury to the property of a corporation or for impairment or destruction of its business *is in the corporation,* and such an injury, *although it may diminish the value of the capital stock,* is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation.") (emphasis added) *accord Kramer v. Western Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.1988) ("[W]here a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature") (citations omitted).

■ A complaint that, like this one, alleges no injury to shareholders distinct from diminution of share value does not state a cause of action that can be brought directly in a class action. *See Olesh,* 1995 WL 500491 at *6 (limiting plaintiffs to derivative action under § 36(a)); *Waller,* 49 A.2d at 452–53; *see also* Hanks, *Maryland Corporation Law,* § 7.21[c], at 264; *accord Arent v. Distribution Sciences, Inc.,* 975 F.2d 1370, 1374 (8th Cir.1992).

■ Moreover, Strougo's allegations in this case are expressly based on asserted breaches of fiduciary duty. Such claims of breach of duty by directors and other fiduciaries of a corporation generally are regarded as derivative rather than direct, since the duty is owed to the corporation and its shareholders as a whole, and the impact of a breach is felt by the corporation. *See, e.g., O'Donnell v. Sardegna,* 336 Md. 18, 646 A.2d 398, 402–03 (1994) (plaintiffs whose claims included breach of fiduciary duty held limited to derivative action); *Olesh,* 1995 WL 500491 at *7 (actions for breach of fiduciary duty generally derivative in nature), *citing* Robert C. Clark, *Corporate Law* § 15.9 (1986) ("The kinds of suits that are derivative in nature include most cases based on breach of the fiduciary duties of care and loyalty. These include, for example, suits based on ... gross negligence [and] basic self-dealing"); *see also Litman v. Prudential–Bache Properties, Inc.,* 611 A.2d 12, 15–16 (Del.Ch.1992); *Lochhead v. Alacano,* 662 F.Supp. 230, 231–32 (D.Utah 1987) (*Lochhead I*) (under majority rule, fiduciary duties run only from directors to corporation, not to individual shareholders).

Two recent cases considering efforts to assert direct class action claims for breach of fiduciary duty under Section 36(a) and the common law with respect to rights offerings are instructive. In *In re Nuveen Fund Litig.,* 855 F.Supp. 950 (N.D.Ill.1994) (*Nuveen I*), the Court dismissed direct claims challenging rights offerings by two closed-end funds (the "Nuveen Funds") and declared that the suit would have to be pursued as a derivative one. Applying Minnesota law, the Court explained:

> Plaintiffs' alleged injuries are not distinct from the alleged injuries to all the Nuveen funds' shareholders. The defendants' actions were the same with respect to all the shareholders. Plaintiffs allege that all the ... shareholders were harmed because the offerings caused the Nuveen funds' per-share value to decline and the fees paid by the ... funds to cover the costs of the offerings (underwriting and advisory services) have siphoned money out of the ... funds to defendants. An injury shared by

all the shareholders of a corporation cannot be personal to each shareholder. *Id.* at 954.

Similarly, in *King v. Douglas,* Civ.No. H–96–1033, slip op., 1996 WL 907734 (S.D.Tx. Dec. 23, 1996), the Court dismissed the plaintiffs' direct claims challenging a rights offering under Section 36(a). The Court reasoned that allegations of reduced NAV and market value and dilution in the value of existing shareholders' interests did not state a direct claim because the alleged actions "affect all shareholders equally, proportionate to each shareholder's ownership interest." Slip op. at 41.

Strougo, however, contends that his injury is separate and distinct from any injury to the Fund. If the injury to the shareholder is separate and distinct from any injury suffered either directly by the corporation or derivatively by the stockholder because of the injury to the corporation, a shareholder will have a direct cause of action. Hanks, *Maryland Corporation Law,* § 7.21[b] at 263–64. This will be the case, for example, where the corporation or the board violates a duty owed directly to a shareholder as an individual, rather than as a shareholder. *See Olesh,* 1995 WL 500491 at *7 (action is derivative unless "special relationship" exists between shareholder and defendant that might create duty other than that owed to corporation); *Empire Life Ins. Co. v. Valdak Corp.,* 468 F.2d 330, 334–36 (5th Cir.1972) (shareholder who pledged securities to defendant and then acted to diminish the value of the securities permitted to sue directly because defendant pledgee owed direct legal duty to plaintiff as pledgor not to diminish collateral); *Chase Nat'l Bank v. Sayles,* 30 F.2d 178, 183 (D.R.I.1927) (direct suit permitted where "independent fiduciary relation" existed between plaintiff shareholder and defendant officer, because defendant was plaintiff's agent).

Strougo here has made no allegation that he or the class of shareholders he purports to represent has any independent or special relationship to the defendants other than that of shareholder of the Fund. As a result, there is no direct cause of action resulting from the breach of a special relationship.

Strougo, however, contends that the Complaint demonstrates that although all shareholders were affected by the Rights Offering, they were not all affected equally, and thus there is a special injury permitting a direct action. For example, Strougo contends that those who did not exercise their rights were affected differently from those who did. Thus, he contends, the injury to shareholders is distinct from the injury to the corporation.

However, the fact that a shareholder might be differently affected by a rights offering based on his own election whether or not to exercise rights given equally to all shareholders does not make his injury distinct from injury to the corporation. So long as the defendants' action toward all shareholders was the same, and any disproportionate effect was the result of the various shareholders' responses to the action, the shareholders have no direct action. *See Nuveen I,* 855 F.Supp. at 955 (dilution in shareholders' proportionate voting rights not basis for direct action, where proportionate rights changed because some shareholders exercised rights where others did not; defendants' actions were same as to all); *King,* slip op. at 41 ("Plaintiffs' allegations that the effect on shareholders' voting rights will be disproportional because some will exercise their rights and purchase new additional stock while others [will not] must … fail as a basis for a direct claim. … Defendants' actions were the same as to all shareholders and did not disproportionately create the change in ownership or ultimately in voting rights; the shareholders chose whether to participate or not.")

Strougo cites a number of cases that purportedly support the proposition that dilution of share value creates a direct cause of action in the shareholder. However, the cases cited involved situations in which one class or group of stockholders benefitted at the expense of another class of shareholders, who were then permitted to sue directly. In *Alleghany Corp. v. Breswick & Co.,* 353 U.S. 151, 160, 77 S.Ct. 763, 769, 1 L.Ed.2d 726 (1957), for example, minority common stockholders had standing to bring a direct suit when the corporation issued preferred stock that would be convertible into common stock,

which would effectively dilute the minority common stockholders' equity, but not the equity of the existing preferred stockholders, who could increase their common stock ownership, while the common stockholders could not.

A number of the other cases cited by Strougo involved similar circumstances in which majority or otherwise controlling shareholders inflicted special injuries that fell only on minority shareholders. For example, in *Lochhead v. Alacano,* 697 F.Supp. 406, 411–13 (D.Utah 1988) (*Lochhead II*), minority shareholders had standing to bring a direct suit when the directors and majority shareholders approved a stock option plan that disproportionately benefitted them, at the expense of minority shareholders. *See also Swanson v. American Consumer Indus., Inc.,* 415 F.2d 1326, 1332 (7th Cir.1969) (permitting minority shareholders fraudulently induced to forego appraisal rights to sue directly, because principal shareholder wasted assets of company for own benefit); *Bennett v. Breuil Petroleum Corp.,* 99 A.2d 236, 239 (Del.Ch.1953) (director and minority shareholder permitted to sue directly where majority allegedly "deliberately caused the stock to be issued to impair plaintiff's interest and to force him out of the corporation").

Unlike the plaintiffs in these cases, Strougo has not alleged that he is a minority shareholder whose ownership interest was diluted disproportionately to that of majority shareholders. All shareholders here were treated equally and could prevent disproportionate dilution by exercising their rights to purchase the newly issued shares.

Accordingly, Claims II and IV will be dismissed.

## III. *The Derivative Claims Under Section 36(a) & Maryland Law*

### A. *Exhaustion of Intracorporate Remedies*

The defendants contend that the derivative claims under Section 36(a) and the common law of Maryland should be dismissed for failure to allege with particularity, as required by Fed.R.Civ.P. 23.1, the reasons he has not made a.demand on the Fund's di-

rectors and shareholders prior to instituting this action.

As the Fund is a Maryland corporation, Maryland law governs whether demand is required and the conditions that will excuse demand. *See Kamen,* 500 U.S. at 101–09, 111 S.Ct. at 1719–23; *see also Langner v. Brown,* 913 F.Supp. 260, 265 (S.D.N.Y.1996); *Olesh,* 1995 WL 500491 at *8. As a matter of federal law, Fed.R.Civ.P. 23.1 itself requires that the grounds for excusing demand under state law be pleaded with particularity. *See Grill v. Hoblitzell,* 771 F.Supp. 709, 710 n. 2 (D.Md.1991), *citing Kamen,* 500 U.S. at 109 n. 10, 111 S.Ct. at 1723 n. 10.

Under Maryland law, courts ordinarily "will not entertain a derivative suit by a stockholder on behalf of a corporation until it appears that the intra-corporate remedies have been unsuccessfully pursued by the complaining stockholder." *Parish v. Maryland & Virginia Milk Producers Ass'n. Inc.,* 250 Md. 24, 242 A.2d 512, 544 (1968). This means that, in general, the stockholder must make a demand for remedial action on the corporation itself, first by application to the directors, and then by application to the body of the stockholders. *id., citing Eisler v. Eastern States Corp.,* 182 Md. 329, 35 A.2d 118, 119 (1943).

However, prior demand on the directors and shareholders is excused when it would be futile. *Parish,* 242 A.2d at 544. The futility exception is to be applied in a practical, common-sense manner. *Id.* at 544–45.

### 1. *Demand on Directors*

Strougo's principal argument for excusing demand against the directors is that six of the Brazil Fund's seven directors have disqualifying financial and professional interests as a result of their paid service on the boards of other Scudder-managed funds, such that they could not impartially consider a demand or impartially prosecute this action against Scudder or themselves.

Under Maryland law, demand is excused where the directors are "dominated and controlled" by persons alleged to be

guilty of the misconduct charged in the complaint. *See Grill*, 771 F.Supp. at 711; *see also Rales v. Blasband*, 634 A.2d 927, 936 (Del.1993) (under Delaware law, to establish lack of independence excusing demand, plaintiff must show that directors are "beholden" to interested party or so under interested party's influence that discretion is "sterilized").

Padegs, Bratt and Villani, who are all employed directly by Scudder, are concededly "interested" in the Rights Offering. However, the defendants contend that the remaining board members, Fiedler, Nolen, Nogueira and Da Costa, are "independent" of Scudder, and therefore are able evaluate a demand and prosecute any action on behalf of the Fund. They contend that the receipt of director's fees and service on the boards of multiple funds managed by Scudder are insufficient to render these defendants "interested" in the transaction.

■ Ordinarily, allegations that directors receive fees for their services are not sufficient to demonstrate demand futility. *See Kamen v. Kemper Financial Services*, 939 F.2d 458, 460 (7th Cir.1991) (applying Maryland law). If the opposite were true, the futility exception would swallow the demand rule, since most corporate directors receive remuneration for their service. *Id.*

■ Similarly, allegations of business relationships among directors are generally insufficient to overcome the presumption of independence enjoyed by corporate directors. *See Id.* (fact that independent directors come to board on recommendation of corporate insiders does not excused demand); *Grill*, 771 F.Supp. at 712 (vague assertions that "personal relationships" among directors make it unlikely that board would authorize suit against current or former members insufficient to excuse demand); *see also Langner*, 913 F.Supp. at 266 (under Delaware law, cross-directorships insufficient to create "interest" excusing demand).

Here, however, Strougo has alleged not only that the purportedly independent directors receive remuneration for their service on the Brazil Fund, but that three of the four—Fiedler, Nolen and Nogueira—receive substantial remuneration from their service on the boards of other mutual funds managed by Scudder. He characterizes Fiedler, Nolen and Nogueira as Scudder's "house directors," essentially as interested in benefitting Scudder (at the potential expense of fund shareholders) as Scudder's own employees.

In *Olesh*, the district court for the Eastern District of New York held that demand upon the directors was futile because the complaint sought a determination that the directors were "interested" by virtue of their receipt of directors fees for sitting on multiple boards managed by a single advisor. 1995 WL 500491 at *8–9. *Olesh* involved a merger that, under the ICA, required the approval of 75% of the non-interested directors of the fund. The court reasoned that demand was futile under these circumstances because, in order for the merger to be approved, the purportedly disinterested directors would have to be replaced if the suit were successful. Thus, the directors' interests in retaining their remuneration and positions were directly at odds with instituting a suit that might ultimately deprive them of these benefits. *Id.* at *9.[2]

Although *Olesh* is distinguishable on the grounds that the suit there would pose a more direct threat to the directors' board positions and remuneration than the present suit would present to the directors of the Brazil Fund, *Olesh* provides some support for the proposition that holding multiple paid directorships of funds managed by the same advisor can compromise a director's independence from the advisor sufficiently to excuse demand under some circumstances. *See also, Rales*, 634 A.2d at 936–37 (court excused demand because of "reasonable doubt" as to independence of board members who were employed by corporations of which the

2. In dictum, the court also stated that demand would not be excused by allegations that the directors' "close business ties" to the fund advisor spoiled their independence. *Id.* at *8–9. However, the court engaged in no explicit discussion of whether the allegations that paid service on the boards of multiple funds managed by the advisor would be sufficient to call into question the directors' independence from the advisor.

alleged wrongdoers were directors or majority stock-holders).

The leading commentator on Maryland Corporation Law has stated that demand should not be excused "so long as there are two directors whose involvement in the facts underlying the claim is not so great as to call into question their compliance with the standard of conduct of Section 2–405.1" of the Maryland Corporations and Associations Code. Hanks, *Maryland Corporation Law,* § 7.21[c] at 269 (1994–1 Suppl.). Section 2–405.1(a) provides that a director shall perform his or her duties "in good faith," "in a manner he reasonably believes to be in the best interests of the corporation" and "with the care that an ordinarily prudent person in a like position would use under similar circumstances." These statutory provisions are Maryland's codification of the fiduciary duties of a director. "Good faith" is "the absence of any desire to obtain a personal benefit or a benefit for some person other than the corporation." Hanks, *Maryland Corp. Law,* § 6.6[b] at 163 (1992 Suppl.).

Here, the fact that all but one of the directors who approved the Rights offering received substantial compensation from funds managed by Scudder, and the allegation that, in approving the rights offering, these directors put the interests of Scudder in increasing their advisor's fees before the interests of the Fund and its shareholders "call into question" whether there was a desire on the part of the directors to benefit Scudder, rather than the Fund, in order to please Scudder to retain their lucrative directorships. In Maryland, two is the minimum number of directors necessary to form a committee to consider a demand. Hanks, *Maryland Corporation* Law, § 7.21[c] at 269, n. 173 (1994–1 Suppl.). Because only one of the directors does not serve on multiple Scudder boards, the Board could not appoint a committee of sufficiently disinterested directors to consider a demand by a shareholder to institute litigation, and thus demand would be futile.

The defendants contend that imposing a rule that would effectively eliminate multiple directorships in complexes of funds managed by a single advisor is inappropriate for several reasons. First, they contend that such practices are common and provide substantial benefits to investors, such as reduced costs and the ability of directors to use their knowledge gained from one fund in the service of others. Moreover, they contend, the ICA's definitions of an "interested person" do not include a limitation on directorships of multiple funds in a fund complex. Similarly, the SEC has not prohibited such multiple directorships, but merely required their disclosure in proxy materials. *See* Amendments to Proxy Rules for Registered Investment Companies, 57 S.E.C. Dock.2019, 2025 & n. 26 (Oct. 13, 1994) ("receipt of substantial amount of compensation from a fund complex is not necessarily determinative of the director's independence").

Although multiple directorships are not *necessarily* determinative of a director's independence, either under the statute or the SEC's interpretations, where, as here, a director's actions are alleged to establish that he or she may be acting in the interests of the advisor, the receipt of substantial remuneration from a fund complex does call into question the director's independence from the manager of that complex. Moreover, the rule would not eliminate multiple directorships. It would require only that a sufficient number of directors without such multiple directorships serve on a board so that a litigation committee could be convened to consider proposed litigation.

Accordingly, demand on the board of directors is excused as futile.

### 2. *Demand on Shareholders*

[15] As set forth above, Maryland law requires demand on shareholders or allegations of why such demand was not made. *See Parish,* 242 A.2d at 545; *Grill,* 771 F.Supp. at 713 n. 5. Although the Complaint does not explicitly identify the allegations that excuse shareholder demand, the allegations as a whole are sufficient to excuse demand in this case.

It should be noted that no Maryland case has based a dismissal solely on failure to make demand on shareholders, and the shareholder demand rule has been widely criticized. *See* Hanks, *Maryland Corpora-*

*tion Law,* § 7.21[d]. Stockholders are generally poorly equipped to make a determination whether to sue, since they lack the information available to directors and "are prone to approve the managers' acts reflexively." *Kamen,* 939 F.2d at 462 (discussing Maryland law). As a result, demand on shareholders is rarely necessary. *Id.*

Demand on a corporation's shareholders has been held to be futile where the shareholders would have to direct the corporation's directors to sue themselves. In *Zimmerman v. Bell,* 585 F.Supp. 512 (D.Md. 1984), an action alleging breach of fiduciary duty against directors under Maryland law, the court held that shareholder demand was excused. The court stated:

> Although a practical solution to this problem (when all of the members of a corporation's board of directors are alleged wrongdoers named as defendants) would be for the shareholders to authorize the demanding plaintiff to prosecute·a derivative suit on the corporation's behalf, such a remedy is not sanctioned by Maryland law. Given the fact that the shareholders would either have to order the directors to maintain the action against themselves, or to remove the present board and replace it with one that could maintain the suit against the former directors, it is readily apparent that there is no reason to require the plaintiffs here to have made a demand on the stockholders. *See Oldfield v. Alston,* 77 F.R.D. 735, 742 (N.D.Ga.1978) (applying Maryland Law).

*Id.* at 516.

As in *Zimmerman,* the shareholders here would be asking the defendants to sue themselves or would have to replace the present board with one that could prosecute the suit. Accordingly, demand on the shareholders is excused.

### B. *Failure to State a Claim*

#### 1. *Private Right of Action*

The defendants contend that the claim under Section 36(a) should be dismissed because that provision, which expressly authorizes enforcement by the SEC, does not provide a private right of action.

Section 36(a) provides, in pertinent part:

> The Commission is authorized to bring an action ... alleging that a person serving or acting [as an officer, director, member of any advisory board or investment adviser] has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company ...

15 U.S.C. § 80a–35(a).

Courts have long held that a private litigant may commence an action under Section 36(a) of the ICA, though the section expressly refers only to SEC enforcement. *See In re Nuveen Fund Litig.,* No. 94 C 360, 1996 WL 328006, at *5 (N.D.Ill. June 11, 1996) (*Nuveen IV*) (noting that "Federal courts have widely implied private causes of action under the ICA for over thirty years."). However, defendants contend that in light of the Supreme Court's decision in *Central Bank N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that the authority supporting an implied private right of action should be reconsidered and rejected.

In *Central Bank,* the Supreme Court rejected a claim of aiding and abetting liability under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 because such a claim was not supported by the text of the Exchange Act. As noted by the *Nuveen* court, "*Central Bank* was concerned with the scope of conduct prohibited by statute, and did not directly address the question of implying causes of action." *Nuveen IV,* 1996 WL 328006, at *6.

Here, unlike the claim of aiding and abetting liability at issue in *Central Bank,* Strougo's claim for breach of fiduciary duty is supported by the text of Section 36. *Compare Central Bank,* 511 U.S. at 172–74, 114 S.Ct. at 1446 ("With respect, however, to the first issue, the scope of conduct prohibited by § 10(b), the text of the statute controls our decision.").[3] And, unlike *Central Bank,* such

---

**3.** In the absence of congressional authorization

granting a right of action under a statute, a court

a claim is not supported by mere "oblique references to such liability in later reports by congressional committees." *Nuveen IV,* 1996 WL 328006, at *6. Instead, "in the course of considering substantial changes to the ICA," Congress "determined the required changes to the ICA with implied private rights of action in mind." *Id.*

Section 36(a) expressly prohibits conduct constituting a breach of fiduciary duty involving personal misconduct. Like its predecessor, Section 36, which authorized the SEC to bring suit for injunctive relief to remedy "gross misconduct or gross abuse of trust" by persons associated with the mutual fund or its adviser, Section 36(a) embodies a Federal common law of fiduciary obligations. *Aldred Trust v. S.E.C.,* 151 F.2d 254, 255, 260 (1st Cir.1945) ("§ 1(b) of the Act, 15 U.S.C.A. § 80a–1(b), in effect codifies the fiduciary obligations placed upon officers and directors of investment companies."); *Brown v. Bullock,* 294 F.2d 415, 421 (2d Cir.1961); *Fogel v. Chestnutt,* 533 F.2d 731, 745 (2d Cir.1975) ("*Fogel I* "); *Moses v. Burgin,* 445 F.2d 369, 373 (1st Cir.1971); *Lessler v. Little,* 857 F.2d 866, 870 (1st Cir.1988).

Under the original Section 36, courts routinely implied a right of action for private litigants. *See, e.g., Brown,* 194 F.Supp. at 224–27; *Tanzer v. Huffines,* 314 F.Supp. 189, 195 (D.Del.1970); *Moses,* 445 F.2d at 373. This result did not change when Congress overhauled the ICA in 1970. *See Fogel v. Chestnutt,* 668 F.2d 100, 105–12 (2d Cir.1981) ("*Fogel II* "); *Bancroft Convertible Fund v. Zico Holdings,* 825 F.2d 731, 735–36 (3d Cir. 1987); *Whitman v. Fuqua,* 549 F.Supp. 315, 321–22 (W.D.Pa.1982); *Dowling v. Narragansett Capital Corp.,* 735 F.Supp. 1105, 1114–15 (D.R.I.1990).

In 1970, Congress reexamined and amended the ICA. Congress amended Section 36 by creating two subsections: 36(a) and 36(b). Recognizing that the original Section 36 proved to be ineffective in dealing with breaches of fiduciary duty with respect to adviser's fees, Congress expressly permitted shareholders the right to commence an action on behalf of a fund to recover excessive fees charged by the investment adviser. However, as Judge Friendly observed in *Fogel II:*

> there is no reason to conclude that, by adopting a modified version of the SEC's proposal to afford an express private remedy with respect to one problem as to which the 1940 Act proved ineffective, the 1970 Congress meant to withdraw the implied private cause of action in other areas which had been recognized over the previous decade by four courts of appeals....

668 F.2d at 112.

This analysis is consistent with the legislative history underlying the amendment to the statute. The Senate and House reports discussing Section 36(a) emphasize that "the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a)."[4] S.Rep. No. 91–184, 91st Cong. 1st Sess. 16 (1969) (the "Senate Report"); H. Rep. No. 91–1382, 91st Cong.2d Sess. 38 (1970) (the "House Report"). As the Court observed in *Tannenbaum v. Zeller,* 552 F.2d 402, 417 (2d Cir.1977): "Congress did not intend this modification [the addition of Section 36(b) ] to abrogate the private action already recognized under the Act for other types of breach of fiduciary duty." (citing *Fogel I* ); *see also Moses,* 445 F.2d at 373 n. 7; *Bancroft,* 825 F.2d at 735 ("Inclusion of such an express private remedy has nothing to do with other

may imply such a right where "persuasive evidence" shows "that Congress intended to create one." *Spicer v. Chicago Bd. of Options Exch.,* 977 F.2d 255, 258 (7th Cir.1992); *In re ML–Lee Acquisition Fund II, L.P. Sec. Litig.,* 848 F.Supp. 527, 538 (D.Del.1994); *Karahalios v. National Fed. of Fed'l Employees, Local 1263,* 489 U.S. 527, 532–33, 109 S.Ct. 1282, 1286–87, 103 L.Ed.2d 539 (1989). In the event that the statute does not resolve the matter, courts consider other factors in determining congressional intent: the legislative history; the contemporary legal context in which Congress acted; and general

rules of statutory construction. *Central Bank,* 511 U.S. at 174–76, 114 S.Ct. at 1447; *Spicer,* 977 F.2d at 258.

4. The complete sentence in the Senate Report reads: "Although section 36(b) provides for an equitable action for breach of fiduciary duty as does 36(a), the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a)." *Id.*

798

sections of the Act, however, and in no way suggests a congressional intent to abolish established implied causes of action for their enforcement."); *Fogel II,* 668 F.2d at 112; *Whitman,* 549 F.Supp. at 322.

In 1980, Congress again amended the ICA in the Small Business Investment Incentive Act of 1980, Pub.L. No. 96–477, 94 Stat. 2275 (1980). That amendment left intact those provisions from which courts had been implying a right of action for private litigants. The amendment's legislative history strongly suggests congressional endorsement of private enforcement in general and, in particular, private enforcement with regard to breaches of fiduciary duty involving small business development companies:

> The Committee wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. Such a right would be consistent with and further Congress' intent in enacting that provision, and where such actions would not improperly occupy an area traditionally the concern of state law. In appropriate instances, for example, breaches of fiduciary duty involving personal misconduct should be remedied under Section 36(a) of the Investment Company Act. With respect to business development companies, the Committee contemplates suits by shareholders as well as by the Commission, since these are the persons the provision is designed to protect, and such private rights of action will assist in carrying out the remedial purposes of Section 36.

H. Rep. 96–1341, 96th Cong., 2d Sess. 28–29 (1980), U.S.Code Cong. & Admin. News at 4800, 4810–11, quoted in *Bancroft,* 825 F.2d at 735–36 (footnotes omitted). In endorsing the private right of action under Section 36(a) for shareholders of small business development companies, Congress relied upon the House Report accompanying the 1970 amendments. *Bancroft,* 825 F.2d at 736.

The *Nuveen* court observed that this legislative history demonstrates an "enthusiastic expression of [Congressional] intent" rather than "mere silence or legislative inaction"

with regard to implying a private right of action under Section 36(a). *Nuveen IV,* 1996 WL 328006, at *6.

Accordingly, Strougo has a private right of action to pursue his claims under Section 36(a).

### 2. *"Personal Misconduct" Under Section 36(a)*

 Defendants urge that the Section 36(a) claim should be dismissed because Strougo has failed to allege "personal misconduct" within the meaning of the statute.

Congress enacted the ICA in response to concerns that the existing securities laws did not protect mutual fund shareholders from potential abuse by fund advisors, whose relationships with the funds they manage are "fraught with potential conflicts of interest." *Burks v. Lasker,* 441 U.S. 471, 480–81, 99 S.Ct. 1831, 1838–39, 60 L.Ed.2d 404 (1979). Most of the provisions of the ICA prohibit narrowly defined conduct; Section 36, in contrast, was designed as a "reservoir of fiduciary obligations" to prevent more "subtle abuses ... not otherwise specifically dealt with in the Act." *Brown v. Bullock,* 194 F.Supp. 207, 250, n. 1 (S.D.N.Y.), *aff'd,* 294 F.2d 415 (2d Cir.1961). Such abuses include a director's "lack of independence resulting in the subordination of the stockholders' interest to that of management." *Id.* Strougo has alleged that precisely such a lack of independence led the directors to approve the Rights Offering to benefit Scudder, without regard to the consequences for the Fund.

Defendants read the phrase "involving personal misconduct" to require that a plaintiff allege more than a "mere" breach of fiduciary duty. They note that most cases imposing liability under Section 36(a) have involved allegations of fraud, self-dealing, or some likelihood of direct personal financial advantage to be derived from the transactions in question. *See, e.g., SEC v. Commonwealth Chem. Sec., Inc.,* 410 F.Supp. 1002, 1018 (S.D.N.Y.1976) (Section 36(a) violation for self-dealing), *aff'd in relevant part, modified in part,* 574 F.2d 90 (2d Cir.1978); *Fogel I,* 533 F.2d 731 (violation for failure to adequately disclose possibility of recapture).

In further support of this argument, the defendants refer to the legislative history of the 1970 amendments to Section 36. Section 36(a) formerly permitted suits only if they were based upon "gross misconduct or abuse of trust." In 1967, the SEC proposed that the standard be lowered to a simple "breach of fiduciary duty." The Senate rejected this proposal, noting that the lower standard would permit SEC sanctions "based on 'nothing more than a difference of opinion about the most debatable management problems.'" S. 1659, 90th Cong., 1st Sess. § 20 (1967), Part I at 308, *reprinted in Mutual Fund Legislation of 1967: Hearings on S. 1659 before the Senate Comm. on Banking & Currency,* 90th Cong., 1st Sess. (1967).

The SEC's proposed bill did not pass, and when reintroduced in the next Congress it contained the additional words "involving personal misconduct." In reporting the revised bill, the Senate committee stated:

> The amended section [36(a)] will enable the Commission to move against officers, directors, and advisory board members of an investment company and its investment advisers or principal underwriters if they engage in conduct which violates prevailing standards of fiduciary duty involving personal misconduct.

> This section is intended to deal only with such violations committed by individuals. It is not intended to provide a basis for the Commission to undertake a general revision of the practices or structures of the investment company industry. On the other hand, your committee does not intend to limit the Commission under this section to situations where actual intent to violate the law can be shown or to acts of affirmative misconduct. In appropriate cases, nonfeasance of duty or abdication of responsibility would constitute a breach of fiduciary duty involving personal misconduct.

Senate Report at 34, S. 3724, 90th Cong., 2d Sess., § 20. (July 1, 1968).

However, the Second Circuit has concluded that Section 36(a), as amended, imposes fiduciary duties "at least as stringent as those at common law." *Tannenbaum,* 552 F.2d at 416 n. 10. Common law breach of fiduciary duty is properly pleaded where, as here, corporate directors are alleged to have put their interests or the interests of another before the interests of the corporation. The legislative history cited by the defendants is not to the contrary. First, consistent with *Tannenbaum*'s equation of Section 36(a) Is standards with common law standards, the Senate report quoted above indicates that a defendant will be liable if he "engage[s] in conduct which violates *prevailing standards of fiduciary duty* . . . ." Moreover, the "personal misconduct" language appears to be intended to prevent generalized SEC attacks on industry practices that would not violate traditional standards of fiduciary duty, as opposed to individual suits involving accepted breaches of fiduciary duty. The legislative history does not indicate an intention to require allegations of fraud or self-dealing. Indeed, the Senate Committee noted that the section did not require a showing of "affirmative misconduct," such as fraud. Instead, the Committee stated that "[i]n appropriate cases, nonfeasance of duty or abdication of responsibility would constitute a breach of fiduciary duty involving personal misconduct." Senate Report at 34; *see also Nuveen IV,* 1996 WL 328006 at *12.

Although, as defendants note, most of the cases finding Section 36(a) liability involved fraud or self-dealing, defendants do not cite any case law squarely rejecting a claim under Section 36(a) for failure to allege fraud or self-dealing.[5] Moreover, the court in *Nuveen* held that a claim of violation of Section 36(a) was stated by allegations that arguably involve less "personal misconduct" than that charged here. *See In re Nuveen Fund Litig.,* No. 94 C 360, 1996 WL 328003 (N.D.Ill. June 11, 1996) (*Nuveen III*).

In *Nuveen III,* the plaintiffs alleged that the independent directors relied solely upon

---

5. *Olesh* is not to the contrary. In *Olesh,* the court rejected plaintiffs' attempt to invoke Section 36(a), because the plaintiffs did not allege any misconduct against the officers of the fund manager, who were not even named as defen-

dants. *See Olesh,* 1995 WL 500491 at *20. Here, in contrast, the Fund's directors are named as defendants and alleged to have personally breached their duty of loyalty to the funds.

the advisor for financial analysis of a rights offering, that they failed to question the likely consequences of the offering, and that two of the independent directors had stated that they could not conceive that the advisor would provide biased information. *Id.* at *5. The court noted that, "[i]n contrast to other investment decisions, the principle immediate consequence of [the rights offerings] was to increase each Fund's asset base by approximately 15%, directly implicating the Adviser's self-interest in generating additional fees." *Id.* at *7. The court held that, given the potential self-interest on the part of the advisor, the failure to more closely scrutinize the risks and benefits of the rights offerings constituted "gross negligence" sufficient to state a cause of action. *Id.* at *8. *See Also Nuveen IV*, 1996 WL 328006, at *12 (directors' abdication of responsibility to protect shareholders from advisor's self-dealing constitutes breach of fiduciary duty involving personal misconduct)

Here, Strougo has alleged not only that the directors were negligent in failing to scrutinize Scudder's proposed Rights Offering, but that they affirmatively acted to benefit Scudder by approving the Rights Offering without regard to the Fund's interests because of the financial benefits they received from sitting on the boards of multiple Scudder funds. By placing the interests of self or management before the interests of the corporation, such conduct violates the "prevailing standards of fiduciary duty" Congress intended to incorporate into Section 36(a).

 Accordingly, as to the Scudder Defendants and defendants Fiedler, Nolen and Nogueira, there are sufficient allegations of "personal misconduct" to satisfy Section 36(a). As to defendant Da Costa, however, there is no basis for inferring that he is so beholden to Scudder that he would not act in the Fund's best interests. Therefore, the Section 36(a) claim against Da Costa will be dismissed.

### 3. *Statutory Authorization of Rights Offerings*

 The defendants also contend that Strougo's Section 36(a) claim should be dismissed because Section 23(b) of the ICA expressly permits rights offerings at below NAV when the rights are offered to current shareholders. They contend that in the absence of allegations differentiating this rights offering from any other rights offering conducted in compliance with Section 23(b), Strougo has not stated a claim under Section 36(a).

Section 23(b) provides, in pertinent part that:

> No registered closed-end company shall sell any common stock of which it is the issuer at a price below the current net asset value ... except (1) in connection with an offering to the holders of one or more classes of its capital stock.

15 U.S.C. § 80a–23(b).

Although Section 23(b) expressly exempts rights offerings limited to current shareholders from the general prohibition on rights offerings below NAV, it does not provide a "safe harbor" from attacks on such offerings if they violate other provisions of the ICA. *See Nuveen IV*, 1996 WL 328006 at *9.

Defendants contend, however, that Strougo has not pleaded any reason why this Rights Offering should not be subject to the exemption. They claim that mere allegations of dilution and the fact that the advisor's fee will increase are insufficient because these are the effects of all rights offerings under section 23(b). Cf. *Schreiber v. Burlington Northern, Inc.*, 568 F.Supp. 197, 202–03 (D.Del.1983) (alleging consequences inherent in transaction that is not *per se* illegal does not, without more, state a claim of market manipulation under § 14(e) of the Securities Exchange Act of 1934), *aff'd*, 731 F.2d 163 (3d Cir.1984), *aff'd*, 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985).

However, Strougo alleges that the directors who approved the Rights Offering were beholden to Scudder by virtue of their lucrative positions on the boards of other Scudder-managed funds, and thus breached their duty of loyalty by putting their own interests and Scudder's before the interests of the Fund. This allegation of a breach of the duty of loyalty distinguishes a permissible rights offering at below NAV, which may be permissible even if there is dilution and a

depression of share values, from a rights offering that is impermissible because it violates another provision of the ICA. Had a committee of truly independent directors, those without multiple directorships) approved the Rights Offering, it may have come within the protections of Section 23(b), provided the committee violated no other duties imposed by the ICA (such as the duty of care apparently breached by the *Nuveen* defendants).

Thus, because the Complaint alleges a breach of the duty of loyalty, section 23(b) does not exempt this Rights offering from an attack under section 36(a).

#### 4. *Breach of Fiduciary Duty Under Maryland Law*

 Under Maryland law, corporate directors owe a fiduciary duty to the corporation and its shareholders. *Waterfall Farm Sys. Inc. v. Craig*, 914 F.Supp. 1213, 1228 (D.Md.1995) ("Maryland law recognizes that an officer and director of a corporation occupies a fiduciary relationship as regards the corporation"); *Martin Marietta Corp. v. Bendix Corp.*, 549 F.Supp. 623, 633 (D.Md. 1982) ("[i]n Maryland, as elsewhere, directors of a corporation occupy a fiduciary relationship to the corporation and its stockholders.... Directors have the duty to act in a manner they reasonably believe to be in the best interests of the corporation"). To plead a claim for breach of fiduciary duty, a plaintiff must allege: "(1) the presence of [a] fiduciary relationship between the parties; (2) a duty created in the fiduciary by this relationship, to act on behalf of the other party; (3) a breach of this duty by the fiduciary; and (4) damage to the other party caused by the breach." *Diamond v. T. Rowe Price Assocs., Inc.*, 852 F.Supp. 372, 409 n. 175 (D.Md.1994) (adopting Restatement (Second) of Torts § 874). *See also Cramer v. Devon Group, Inc.*, 774 F.Supp. 176, 184 (S.D.N.Y.1991) (there are two elements of

breach of fiduciary duty claims—fiduciary relationship and breach).

 Defendants contend that Strougo has not alleged a breach of any fiduciary duty.

 Maryland Corps. and Assn's Code Ann. Section 2–405.1(a)(1) requires corporate directors to perform their duties in "good faith." "Good faith" is generally synonymous with the duty of loyalty or the duty of fair dealing. James J. Hanks, *Maryland Corporation Law*, § 6.6(b), at 163 (1995–1 Supp.). Whether a director breached his duties of loyalty and good faith are fact-intensive questions. *See, e.g., Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 364 (Del.1994) ("[T]he question of when director self-interest translates into board disloyalty is a fact-dominated question, the answer to which will necessarily vary from case to case."). It is ordinarily inappropriate to resolve such questions on a motion to dismiss. *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199 (Del.1993) (reversing trial court for deciding factual question of good faith on motion for judgment on pleadings under Delaware Chancery Rule 12(c)); *Lewis v. Fuqua*, 502 A.2d 962, 971 (Del.Ch. 1985) (defendants' good faith is question of fact).

In *Desert Equities*, a limited partner brought an action against the general partner alleging breach of contract for wrongfully excluding it from participating in various investments, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. The Chancery Court granted the defendant's motion under Chancery Rule 12(c) for judgment on the pleadings, finding that the plaintiff's allegations of wrongdoing were conclusory and insufficient as a matter of law to state a claim for relief.[6]

On appeal, the Delaware Supreme Court reversed, holding that whether a party acted reasonably or in good faith was a mixed

---

**6.** Delaware Chancery Court Rule 12(c) "is identical with Federal Rule of Civil Procedure 12(c). Since our Court of Chancery rule is modeled after the federal rule, we look to federal decisional law in construing the Court of Chancery Rule." *Desert Equities*, 624 A.2d at 1205 n. 8, citing *Canaday v. Superior Court*, 49 Del. 456,

119 A.2d 347, 352 (1955). A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *George C. Frey Ready-Mixed Concrete Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977).

question of law and fact, "which cannot be resolved on a motion for judgment on the pleadings." 624 A.2d at 1206. The Delaware Supreme Court went on to hold:

[A] fairly pleaded claim of good faith/bad faith raises essentially a question of fact which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery.

624 A.2d at 1208 (citing *Lewis v. Fuqua*, 502 A.2d at 971).

▮ Directors seeking the protection of the business judgment rule "can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Thus, to enjoy the benefits of the business judgment rule and avoid judicial inquiry into a director's decision, the director must be independent of the interested director(s). *Id.* at 815–16 (requirement of director independence from interested persons inheres in business judgment rule). To be independent, the director's decision must be based on the merits of the transaction under consideration rather than extraneous considerations or influences that would "convert an otherwise valid business decision into a faithless act." *Id.* at 816. A director who is dominated or otherwise controlled by or beholden to an individual or entity interested in the transaction at issue is interested. *Id.* at 815. A proper allegation that a director has an interest in an action creates a *prima facie* case that the director did not act in good faith. Hanks, *Maryland Corporation Law*, § 6.6(b), at 165.

Here, as discussed above, all of the Scudder Defendants are interested in the Rights Offering and three of the four purportedly "independent" directors are alleged to be Scudder's "house" directors, receiving substantial compensation for service given to other Scudder managed funds. This close and financially rewarding relationship with Scudder is sufficient to call into question the independence and disinterestedness of these directors with respect to a Rights Offering that would admittedly benefit Scudder and

dilute non-participating shareholders' interests.

▮ Accordingly, the motion to dismiss the Maryland breach of fiduciary duty claims will be denied. However, because defendant Da Costa is not alleged to have received compensation for service on multiple boards of Scudder-managed funds, the state law claims against him will be dismissed.

### 5. *Cognizable Damages*

▮ The defendants contend that the Section 36(a) and Maryland breach of fiduciary duty claims should be dismissed because Strougo has failed to articulate a cognizable theory of injury or damage.

Strougo asserts two types of damage: dilution damage and market damage. He contends that shareholders who did not exercise their rights, including those who sold their transferrable rights, suffered a dilution in their proportionate ownership of total outstanding shares at the close of the Rights Offering.

With respect to market damages, it is alleged that the market value of shares in the Fund were depressed by the Rights Offering and thus traded at a lower price at any given time after the offering than the price at which they would have traded had there been no such offering. In essence, Strougo contends that the additional supply of shares on the market depressed the value of existing investors' shares.

▮ Actual damages are a necessary component of a claim for breach of fiduciary duty. *See Steinbrenner v. Esquire Reporting Co.*, 90 Civ. 6419, 1991 WL 102540, *10 (S.D.N.Y. June 3, 1991). Defendants contend that the dilution and market damage theories advanced by Strougo fail to state a claim of "actual" damage, but do not say why dilution damages and market damages are not "actual" damages. Rather, they contend that a shareholder would suffer no cognizable dilution damages in this context because he or she could recoup any loss by selling the shares on the open market, and that the market damage theory is too speculative and not susceptible of calculation.

While it is true that a shareholder who chose not to exercise her rights could receive money by selling the rights on the market, this does not mean that the shareholder's proportionate share of outstanding stock is not diluted. Moreover, although selling the rights may mitigate the financial consequences of a shareholder's dilution, it does not necessarily extinguish the financial loss.

Defendants also attack Strougo's market damage theory, claiming it is too speculative to support a claim under either the ICA or the common law. Specifically, they contend that because Strougo has not alleged that he sold any of his shares, he has realized no loss in share value. They urge an "out-of-pocket" rule of damages, arguing that allowing plaintiffs to proceed on "abstract" theories of damages without out-of-pocket or trading losses is "legally problematic."

In support of their position that only out-of-pocket losses should be cognizable, defendants cite *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), in which the Supreme Court required that a plaintiff be a purchaser or seller of the securities at issue in order to state a securities fraud claim under Rule 10b–5. The Court noted that permitting claims for damages based on a *failure* to purchase or sell a security would lead to difficult problems of proof. *Id.* at 746–47, 95 S.Ct. at 1930–31. The virtue of the "purchaser-seller" rule is that it limits the class of plaintiffs to those who have dealt with the security, and thus prevents "bystanders to the securities marketing process [from] await[ing] developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market and that unduly pessimistic predictions ... followed by a rising market caused them to allow retrospectively golden opportunities to pass." *Id.* at 747, 95 S.Ct. at 1931.

*Blue Chip Stamps* and the other cases cited by the defendants in support of an out-of-pocket rule involved securities fraud claims, not claims of breach of fiduciary duty. The defendants cite no authority imposing a similar "purchaser-seller" requirement in cases arising under the ICA. Moreover, *Blue Chip Stamps* was decided under Section 10(b) and Rule 10b–5, which expressly require that the plaintiff be injured "in connection with the purchase or sale of any security." No similar requirement exists in the ICA.

Moreover, Strougo is not *Central Bank's* "bystander" awaiting the benefit of hindsight to attack offering materials upon which he can claim he relied, but an owner of shares in a corporation whose value he alleges was diminished by an action that breached the directors' and Fund advisor's fiduciary duties. To require a shareholder to sell his shares to maintain a derivative claim for breach of fiduciary duty would also place the plaintiff in a difficult position, for to realize his total loss and recover full damages he would have to sell all of his shares. As a consequence of selling all of his shares, however, he would likely lose standing to bring a derivative suit on behalf of the corporation. *See Parish*, 242 A.2d at 554 (stockholder cannot sue unless he is stockholder at time derivative suit is instituted and retains stock throughout suit.)

Case law under Section 36(a) does not support defendants' proposed "out-of-pocket" rule. While damages may be more difficult to calculate when there is no out-of-pocket loss or clear and sustained decline in market prices, such difficulty alone will not defeat a claim under Section 36(a). In *Fogel I*, the Second Circuit remanded to the district court to determine damages under Section 36(a), stating:

> The amount for which defendants are to be held liable will depend on the attempt, difficult but ineluctable, of seeking to find what would have been. In deciding this we must mediate between the two principles, given expression in the antitrust laws, that while "a defendant whose wrongful conduct has rendered difficult ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible," *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927), yet recovery "cannot be had unless it is shown, that, as a result of defendants'

acts, damages in some amount susceptible of expression in figures resulted." *Keogh v. Chicago & Northwestern Ry.,* 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183 (1922).

533 F.2d at 755–56. ·

Determining the value of investors' shares "but for" the Rights Offering may be difficult, but no more difficult than it often is to determine what the price of a product or service would be in the absence of anticompetitive or collusive conduct in antitrust cases. Such market damages are "susceptible of expression in figures," though adequate proof of the appropriate figure may be difficult to muster at trial in this case.

With respect to the common law breach of fiduciary duty claim, it appears that state courts have permitted recovery of damages beyond out-of-pocket loss. *See, e.g., 105 East Second Street Assocs. v. Bobrow,* 175 A.D.2d 746, 573 N.Y.S.2d 503, 504 (1st Dept.1991) ("The measure of damages for breach of fiduciary duty is the amount of loss sustained, including lost opportunities for profit on the properties by reason of the faithless fiduciary's conduct").

Accordingly, at this stage of the litigation, plaintiff's allegations of damage are sufficient. ·

#### C. *Rule 9(b)*

■ The Scudder Defendants have also moved to dismiss on the grounds that the Complaint fails to plead with the specificity required by Fed.R.Civ.P. 9(b).

■ Because Rule 9(b) "is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and not extended to other legal theories or defenses." *United States v. Rivieccio,* 661 F.Supp. 281, 289 (E.D.N.Y.1987) (quoting 5 C. Wright and A. Miller, *Federal Practice & Procedure* § 1297, at 405). It is well-established that "Rule 9(b) is not applicable to breach of fiduciary duty ... claims; it ap-

plies only to claims sounding in fraud." *Schupak v. Florescue,* No. 92 Civ. 1189, 1993 WL 256572, *2–*3 (S.D.N.Y. July 8, 1993). *See also Zucker v. Katz,* 708 F.Supp. 525, 530 (S.D.N.Y.1989) (same); *Bosio v. Norbay Sec., Inc.,* 599 F.Supp. 1563, 1570 (E.D.N.Y.1985).

■ It is true that when a breach of fiduciary duty claim is, in substance, a claim of fraud, the requirements of Rule 9(b) are triggered. *See Frota v. Prudential–Bache Sec., Inc.,* 639 F.Supp. 1186, 1193 (S.D.N.Y. 1986) ("Rule 9(b) extends to all averments of fraud or mistake whatever may be the theory of legal duty—statutory, common law, tort, contractual, or fiduciary"). Here, however, Strougo's claims do not sound in fraud.[7]

A fraud is "[a]n intentional perversion of the truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him" or "[a] false representation of a matter of fact, whether by words or conduct, by false and misleading allegations, or by concealment of that which should have been disclosed, which deceives and is intended to deceive another so that he shall act upon it to his legal injury." *Black's Law Dictionary* at 455 (Abridged 6th Ed.1991). *See also Bartels v. Clayton Bro. Co.,* 631 F.Supp. 442, 448 (S.D.N.Y.1986). Strougo alleges that defendants breached their fiduciary obligations to act in the best interests of the Fund and its shareholders, not that they attempted to induce action or inaction on the part of investors by means of falsehoods or material omissions. *See McCoy v. Goldberg,* 810 F.Supp. 539, 548 (S.D.N.Y.1993) ("[t]he principle articulated by Justice Cardozo in *Meinhard*—that a fiduciary may be held liable without proof of deceitful intent—has long remained the uniform law of New York").

Here, in contrast to a securities fraud claim, the shareholders were informed that the Rights Offering would dilute their shares if they did not exercise their rights and that Scudder would benefit from increased fees. To the extent that defendants misrepresented their motives for engaging in the Rights

---

7. Defendants concede as much themselves when they contend that the Complaint should be dismissed because it does not allege fraud or self-

dealing, which Defendants claim is required to satisfy Section 36(a)'s "personal misconduct" standard.

Offering, that misrepresentation is not alleged to have induced any particular action or inaction on the part of investors. In fact, the Complaint alleges that the Rights Offering was "coercive," in that it forced them to subscribe when they would not otherwise have chosen to, not that they were deceived into exercising or selling their rights.

Because Strougo's claim does not sound in fraud, Rule 9(b)'s particularity requirements do not apply.

## IV. *The Excessive Fees Claim*

 Strougo has alleged that the decision to initiate the Rights Offering, by increasing the assets under Scudder's management, had the effect of increasing Scudder's fees in violation of the fiduciary obligations imposed by Section 36(b) of the ICA.

Section 36(b) provides, in pertinent part:

For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by ... a security holder of such registered investment company on behalf of such company, against such investment adviser ... for breach of fiduciary duty in respect of such compensation or payments ...

15 U.S.C. § 80a–35(b).

Section 36(b) was addressed to the problem that "adviser's fees, generally stated as a percentage of the market value of the managed assets, which had been altogether reasonable when a fund was launched, may have become unreasonably high when the fund grew to enormous size." *Fogel II*, 668 F.2d at 111.

However, Section 36(b) was enacted "to address a narrow area of concern: the negotiation and enforcement of payment arrangements between the investment adviser and its fund," *Nuveen IV*, 1996 WL 328006, at *13, not to provide a cause of action separate from 36(a) to govern the adviser's general performance or financial advice with respect to particular transactions. *Id.* at *12, *15.

 Accordingly, to be found liable for a violation of § 36(b), "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir.1982) *citing Fogel II*, 668 F.2d at 112; *see also Kalish v. Franklin Advisers, Inc.*, 928 F.2d 590, 592 (2d Cir.1991).

Strougo has pleaded no facts to support the conclusory allegation that Scudder's compensation after the Rights Offering was unreasonably disproportionate to the value of Scudder's services. He has not alleged that Scudder failed to provide services in connection with the Rights Offering itself, or that Scudder has not actively managed the securities purchased with the capital obtained through the Offering. Indeed, it appears that the Fund has performed well subsequent to the Rights Offering,[8] suggesting that Scudder has invested the new capital with some degree of competence. The allegation that Scudder's fee increased substantially as a result of a Rights Offering in violation of Section 36(a) does not, in itself, support an excessive fee claim under Section 36(b). *See Nuveen IV*, 1996 WL 328006, at *15 (allegation that adviser devised rights offering to generate fees regardless of consequences to fund states claim under 36(a), not 36(b)); *see also Gartenberg*, 694 F.2d at 930–31 (increase in manager's fee from $1.6 million to $39.4 million not violative of section 36(b), where increase resulted from "tremendous increase" in size of fund that led to

---

8. Publicly reported stock quotations reflect that, after an initial drop in share value, the Brazil Fund's share prices rebounded. Although the Fund's improved performance after the Rights Offering does not preclude a finding that the Fund was damaged by that offering, it does tend to rebut any inference that the capital acquired through the offering was managed so deficiently that the fee was "so disproportionately large that it bears no reasonable relationship to the services rendered." *Gartenberg*, 694 F.2d at 928.

greater number of transactions, customers and other activities of manager).

Therefore, the Section 36(b) claim against Scudder will be dismissed.

## V. *The Control Person Claim*

■ Strougo also alleges that the Scudder Defendants caused violations of the ICA by the other directors, in violation of Section 48(a) of the ICA, which provides:

It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder.

15 U.S.C. § 80a–47(a).

Strougo contends that the purportedly "independent" directors of the Fund were in fact controlled by the Scudder Defendants, who "caused" the independent directors to approve the Rights Offering. In support of this contention, he alleges that three of the four independent directors earned very substantial compensation from various Scudder-managed funds, and thus could exert control over their votes.

In *Harriman v. E.I. DuPont de Nemours & Co.*, 372 F.Supp. 101 (D.Del.1974), a case alleging control person liability under both Section 48(a) of the ICA and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, the court observed that the "control person" provision of the Securities Exchange Act "is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction." *Id.* at 105, *quoting Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967). Such indirect means of discipline or influence may include "business relationships [other than stock ownership], interlocking directors, family relationships and a myriad of other factors." *Id.*

The allegation that, through their control of the substantial payments made for service on the boards of multiple Scudder funds, the Scudder Defendants had the means to indirectly discipline or influence Fieldler, Nolen and Nogueira is sufficient to survive a motion to dismiss.

## Conclusion

For the reasons set forth above, defendants' motions are hereby granted in part and denied in part. Specifically:

1. The Complaint as to Da Costa is dismissed in its entirety;

2. The purported class action breach of fiduciary duty claims pursuant to Section 36(a) and Maryland law (Claims II and IV) are dismissed;

3. The motions to dismiss the derivative claims under Section 36(a) and Maryland law (Claims V and VI) are denied, except with respect to defendant Da Costa;

4. The Scudder Defendants' motion to dismiss the Section 48(a) control person claim (Claim III) is denied; and

5. The Scudder Defendants' motion to dismiss the excessive fee claim under Section 36(b) (Claim I) is granted.

It is so ordered.