140 F.Supp.2d 424 (2001)
Phillip GOLDSTEIN, Plaintiff,
v.
LINCOLN NATIONAL CONVERTIBLE SECURITIES FUND, INC., H. Thomas McMeekin, Adela Cepeda, Roger J. Deshaies, Richard Burridge, Thomas Mathers, Thomas L. Brindley, Daniel R. Toll, Defendants.
Civil Action No. 00-2653.
United States District Court, E.D. Pennsylvania.
April 27, 2001.
*425 *426 *427 *428 Gregory E. Keller, Harnes Keller, LLP, New York City, for plaintiff.
David Clarke, Jr., Piper, Marbury, Rudnick & Wolfe LLP, Washington, DC, for defendants.

MEMORANDUM
DuBOIS, District Judge.

I. INTRODUCTION
This action arises out of the reorganization of the Board of Directors of defendant, Lincoln National Convertible Securities Fund (the "Fund" or "LNV"), a subsequent proxy contest, and election of directors at the Fund's May 5, 2000 annual meeting. Plaintiff, Phillip Goldstein ("plaintiff" or "Goldstein"), asks the Court to set aside the election of directors at that meeting and for other related relief on the grounds that defendants breached their fiduciary duty to plaintiff and all other shareholders under federal and state law by enforcing an invalid advance notice deadline for submission of shareholder nominations and proposals and inequitably interfering with the shareholders' right to vote for directors. The Fund contends that the 2000 election was properly conducted and that Goldstein is not entitled to the requested equitable relief as he comes to this Court with unclean hands. After a three day non-jury trial beginning on April 16, 2001, the Court concludes that the Fund improperly precluded plaintiff from presenting his nominees at the annual meeting and distributed a proxy statement that omitted material information, as a result of which plaintiff is entitled to equitable relief.
Plaintiff filed this action on May 24, 2000. On September 15, 2000, defendants filed an Answer with affirmative defenses and a Counterclaim. Plaintiff filed a motion to dismiss the Counterclaim on October 5, 2000 and a motion for partial summary judgment on October 30, 2000. Both of plaintiff's motions were denied by Order dated January 3, 2001.
Based on the following Findings of Fact and Conclusions of Law, the Court finds in favor of plaintiff in part and in favor of defendants in part and will enter judgment accordingly. The Court's findings of fact are set forth in Section II, infra. The Court's conclusions of law are included in its discussion of the legal issues in Section III, infra.

II. FINDINGS OF FACT
1. Plaintiff is an individual who resides in Pleasantville, NY. He has been a stockholder of LNV[1] since March, 1999.
2. Plaintiff manages investments for various clients, including Opportunity Partners, LP ("Opportunity Partners"), a private investment partnership. He is the president of Opportunity Partners' general partner.
3. Defendant LNV is a closed-end mutual fund[2] organized under Maryland law; *429 its headquarters are located at One Commerce Square, 2005 Market Street, Philadelphia, PA 19103.
4. The individual defendants are or were members of the Fund's Board of Directors ("Board") at the time of the events that give rise to this litigation  they constituted the Fund's seven-member Board in 1999 and 2000.
5. Pursuant to an investment advisory agreement, the Fund is managed by Lincoln Investment Management, Inc. ("LIM"), an indirect, wholly owned subsidiary of Lincoln National Corporation.
6. The Fund has no employees. Its business and affairs are conducted primarily by its investment adviser, LIM, which, through its affiliates, manages the Fund's investment portfolio, maintains its accounts and records, and provides executive and administrative services to the Fund. See Ex. P-6 at 17 (LNV's Annual or Semi-Annual Report, filed Mar. 1, 2000). The Fund pays LIM a quarterly management fee of .21875% of the Fund's net assets on the last business day of each quarter. In 1999, the Fund paid LIM fees of approximately $1 million. See Ex. P-6 at 13.
7. The Fund is registered with the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 (the "1940 Act").
8. Article Seven of the Fund's Articles of Incorporation sets forth the powers of the Board that may be exercised without the approval of the shareholders. The powers expressly vested in the Board include the power to (i) make, adopt, alter, amend and repeal bylaws of the Fund; (ii) declare and pay dividends; (iii) make distributions of income and capital gains to avoid or reduce the Fund's liability for income taxes; (iv) issue any of the authorized shares of common stock of the Fund; and (v) authorize the purchase of shares of the Fund's common stock in the open market or otherwise. See Ex. P-5 at 3-4.
9. The Bylaws of the Fund ("Bylaws"), which were last amended on October 20, 1995, contain the following provision relating to annual meetings in Article I, Section 1:
The annual meeting of the shareholders of the Corporation shall be held on the third Friday of April, or such other date within 31 days as may be set by the Board of Directors, in each year ... at 10:00 a.m., at the office of the Corporation in the City of Baltimore, Maryland, or at such other time and place within the United States as may be fixed by the Board of Directors, for the purpose of electing directors and for transacting such other business as may properly be brought before the meeting. Only such business, in addition to that prescribed by law, by the Articles of Incorporation or by these Bylaws, may be brought before such meeting as may be specified by resolution of the Board of Directors, or by writing filed with the Secretary of the Corporation signed by the Chairman of the Board or the President or by a majority of the directors or by shareholders holding at least one-half of the Common Stock of the Corporation outstanding and entitled to vote at the meeting.
Ex. P-10 at LNV 0059.
10. The Fund's Bylaws and Articles of Incorporation do not contain any provisions that restrict the right or ability of a *430 shareholder of the Fund to make a proposal or nominate a candidate for election to the Board at an annual meeting or that require a shareholder to provide advance notice of such a proposal or nomination. See Exs. P-5 and P-10.
11. The Fund's 1999 proxy statement includes a provision that states:
Any stockholder proposals intended to be presented at the [2000] annual meeting and be included in the proxy statement and proxy of the Fund must be in proper form and must be received on or before November 17, 1999. Any stockholder proposals intended to be presented at the [2000] annual meeting, but not to be included in the proxy statement and proxy of the Fund, must be in proper form and must be received on or before January 31, 2000.... The inclusion and/or presentation of any such proposal is subject to the applicable requirements of the proxy rules under the Securities Exchange Act of 1934.
Ex. P-2A at LNV 0025.
12. The 1999 proxy statement was issued on March 16, 1999 for the April 23, 1999 annual meeting of the Fund. The 1999 proxy statement was sent to stockholders of record at the close of business on February 26, 1999  the shareholders who were entitled to vote at the April 23, 1999 meeting. See Ex. P-2A at LNV 0019. Plaintiff was not a stockholder of LNV at the close of business on February 26, 1999.
13. As of April 14, 2000, plaintiff, a private investment partnership he manages (Opportunity Partners), three of plaintiff's clients, and certain of plaintiff's family and friends beneficially owned 205,-911, or approximately 3.2% of the Fund's outstanding shares. See Ex. P-7 at 6 (Definitive Goldstein Proxy Statement, filed April 14, 2000).
14. The Fund's common stock has traded at a discount to net asset value ("NAV") for at least two years. As of March 31, 2000, LNV's common stock was trading at a discount of 19.1% to NAV. See Ex. P-8 at 3 (Definitive LNV Proxy Statement, filed Apr. 26, 2000). On April 7, 2000, the stock traded at a discount of 24.4%. See Ex. P-7 at 2 (Definitive Goldstein Proxy Statement, filed April 14, 2000).
15. Plaintiff sent the nominating committee of the Board a letter dated January 22, 2000 in which he expressed his concern about the discount at which the Fund's stock was trading and asked the nominating committee to consider nominating him as a director of the Fund. Ex. P-3. In his letter, plaintiff stated that if he was elected to the Board, his "primary objective will be to work with the other directors to develop strategies designed to enhance shareholder value by narrowing the discount." Ex. P-3 at LNV 1072. The Fund received plaintiff's letter on January 27, 2000. See Ex. P-3 at LNV 1073.
16. After receipt of plaintiff's letter, the Board obtained research on plaintiff and learned that he was an advocate of measures to reduce the discount at which certain closed-ends funds had traded and that plaintiff had presented proposals at shareholder meetings of other closed-end funds. Tr. Transcript at 53 (testimony of Daniel R. Toll, Apr. 17, 2001); id. at 133 (testimony of H. Thomas McMeekin, Apr. 17, 2001). The Board also learned that he had conducted proxy contests, nominated himself and been elected to the boards of directors of other closed-end funds. Id. at 53 (testimony of Daniel R. Toll, Apr. 17, 2001); id. at 132 (testimony of H. Thomas McMeekin, Apr. 17, 2001).
17. For a number of years, plaintiff has been, and continues to be, an advocate of shareholders of closed-end funds for measures to reduce the discounts at which the shares of closed-end funds trade.
*431 18. On January 28, 2000, at a previously scheduled Board meeting, the individual defendants nominated themselves for election at the May 5, 2000 annual meeting "to serve, if elected, until the next annual meeting of shareholders...." Ex. P-15 at 8.
19. As of the January 28, 2000 meeting, the Fund's Bylaws provided that the directors were to be elected "annually ... until the next annual meeting of shareholders. ..." Ex. P-10, Art. II, Sec. 1.
20. The Board did not discuss plaintiff's January 22, 2000 letter at the Board meeting held on January 28, 2000.
21. The Board held a special telephonic meeting on February 9, 2000 at which it discussed Goldstein's January 22, 2000 letter. See Ex. P-52 (Minutes of the LNV Board meeting held Feb. 9, 2000). Partially in response to that letter, the Board voted to implement a share repurchase program for up to 5% of its shares for the purpose of narrowing the discount. Tr. Transcript at 131-32 (testimony of H. Thomas McMeekin, Apr. 17, 2001) (acknowledging that plaintiff's letter had "some bearing" on the Board's decision to implement a share repurchase program). The Board notified the shareholders of the repurchase program by press release dated February 10, 2000. See Ex. P-17 (LNV press release dated February 10, 2000).
22. At the February 9, 2000 meeting, the Board also authorized the Fund's investment adviser, LIM, to retain Maryland counsel to review the Fund's existing Bylaws and Articles of Incorporation. See Ex. P-52 at LNV 0853-54 (Minutes of the LNV Board meeting held Feb. 9, 2000); Tr. Transcript at 133 (testimony of H. Thomas McMeekin, Apr. 17, 2001).
23. At the February 9, 2000 meeting, after a discussion of Goldstein's letter, the Board decided "to send [him] a letter informing him that, as the slate of Directors had already been determined at the January 2000 Board Meeting for the upcoming Annual Meeting of Shareholders, his letter would be kept on file...." See Ex. P-52 at 2. On March 13, 2000, defendant Daniel R. Toll, as chairman of the nominating committee, sent a letter to plaintiff thanking him for his January 22, 2000 letter and stating that "[a]lthough the slate of Directors for our May, 2000 Annual Meeting has already been set, we will keep your letter on file and consider it in due course." See Ex. P-28. The March 13, 2000 letter was dictated by defendant Toll before the meeting on March 13, 2000. The slate of directors to which Toll referred in the letter was the slate of seven directors that the Board had nominated on January 28, 2000. Tr. Transcript at 69-70 (testimony of Daniel R. Toll, Apr. 17, 2001).
24. On March 9, 2000, Eric Miller, an employee of the Fund's investment adviser, LIM, and the secretary of the Fund, sent a "Notice of Joint Telephonic Board Meeting" to be held on March 13, 2000 to the Board of Directors. See Ex. P-18 (Notice of telephonic meeting dated Mar. 9, 2000). The notice described the purpose of the meeting as follows: "to adopt resolutions in order to (i) stagger the terms of the Board[] of Directors; [and] (ii) authorize the filings of Articles Supplementary. ..." Ex. P-18.
25. The Board did not discuss the possibility of classifying or staggering the LNV Board prior to March 13, 2000. Tr. Transcript at 44, 63 (testimony of Daniel R. Toll, Apr. 17, 2001) (testifying that he does not recall any discussions regarding the possibility of adopting a staggered Board since the Fund's founding in 1986, at which time he became a member of the Board); see also id. at 25 (testimony of Richard M. Burridge, Apr. 18, 2001).
26. On March 13, 2000, the Board held a special telephonic meeting at which it *432 adopted the resolutions that had been set forth in the March 9, 2000 notice. See Ex. P-19 at LNV 0856 (Minutes of the LNV Board meeting held Mar. 13, 2000). Pursuant to these resolutions, the directors voted to classify the Board into three classes of directors, Class I, Class II, and Class III, the members of which would serve for three year terms. The Board also passed a resolution whereby the term of office of the two Class I directors was to continue until the annual meeting in 2000; the term of office of the two Class II directors was to continue until the annual meeting in 2001; and the term of office of the three Class III directors was to continue until the annual meeting in 2002. See id.
27. In addition to adopting a classified board structure at the March 13, 2000 meeting, the Board nominated Adela Cepeda and William Deshaies, two of the Board's current members, as candidates for election to the Class I positions at the 2000 annual meeting. See id. at LNV 0857.
28. On April 7, 2000, the Fund filed Articles Supplementary providing that the Board had elected, pursuant to Title 3, Subtitle 8 of the Maryland Corporations and Associations Code, to classify the Board into three distinct classes of directors, the members of which would each serve for three year terms. See Ex. P-20 (LNV Articles Supplementary, filed Apr. 6, 2000).
29. Defendants did not disclose the creation of the staggered Board to the Fund's shareholders until LNV filed its definitive proxy statement on March 30, 2000 (the "March 30 Proxy") for the annual meeting of shareholders scheduled for May 5, 2000. See Ex. P-4 (Definitive LNV Proxy Statement, filed Mar. 30, 2000).
30. The March 30 Proxy stated that the Board had "implemented a staggered Board consisting of three Classes of Directors." Ex. P-4 at 5. The proxy did not disclose that the decision to classify the Board was implemented by filing Articles Supplementary to the Fund's Articles of Incorporation. See Ex. P-20 (LNV Articles Supplementary, filed Apr. 6, 2000).
31. When plaintiff reviewed the March 30 Proxy on March 31, 2000, and learned that the Fund had created a staggered Board, for which two directors were to be elected for three year terms at the May 5, 2000 annual meeting, plaintiff began to consider nominating directors to fill the new Class I positions and proposing a bylaw amendment. See Ex. P-7 at 5.
32. On March 31, 2000, plaintiff called the Fund's office to obtain a copy of LNV's Bylaws. Tr. Transcript at 148 (testimony of Phillip Goldstein, Apr. 16, 2001). The Fund did not respond to plaintiff's request until April 10, 2000 when Eric Miller, an attorney for the Fund's investment adviser, LIM, refused to provide the Bylaws without proof of plaintiff's ownership of shares of LNV. See Ex. P-34 (letter from Eric Miller to Goldstein dated Apr. 10, 2000). In the interim, on March 31, 2000, plaintiff obtained a copy of the Bylaws from an independent source. See Ex. P-46 (LNV Bylaws, last amended Jan. 15, 1990).
33. Finding no advance notice requirement or other provision regarding the procedure for the nomination of directors in the Fund's Bylaws, and in light of the Board's recent creation of the Class I director positions, plaintiff decided to nominate himself and Ralph Bradshaw, another stockholder in the Fund, for election to the Board as Class I directors. Plaintiff also decided to propose an amendment to the Bylaws that would make the Fund's investment adviser, LIM, more accountable to shareholders by requiring the investment advisory agreement to be approved by shareholders annually. Tr. Transcript at *433 147, 150-51 (testimony of Phillip Goldstein, Apr. 16, 2001); see Ex. P-7. By letters dated April 6, 2000 and April 7, 2000, plaintiff notified the defendants of his nominations and proposed bylaw amendment; he filed his preliminary proxy statement on April 7, 2000. See Exs. P-32 and 33 (letters from Goldstein and Ralph Bradshaw to H. Thomas McMeekin dated Apr. 6, 2001 and Apr. 7, 2001); see Ex. D-80 (Preliminary Goldstein Proxy Statement, filed Apr. 7, 2000).
34. On April 11, 2000, the Board held a special telephonic meeting to discuss Goldstein's April 6, 2000 letter and his preliminary proxy statement. See Ex. P-21 (Minutes of the LNV Board meeting held Apr. 11, 2000). The directors discussed Goldstein's proposals and noted that his proposals had not been submitted prior to the January 31, 2000 deadline included in the Fund's 1999 proxy statement. Id. The Board did not discuss the origin of the deadline contained in the 1999 proxy material, nor did it discuss the source of the Board's authority to impose an advance notice deadline. Tr. Transcript at 79 (testimony of Daniel R. Toll, Apr. 17, 2001).
35. The directors had never discussed or considered the deadline contained in the 1999 proxy statement and the Board never delegated the authority to adopt an advance notice deadline to any other entity. Employees of the Fund's investment adviser, LIM, prepared the 1999 proxy materials, and the Board did not review them in detail before they were issued. Tr. Transcript at 41-42 (testimony of Daniel R. Toll, Apr. 17, 2001); id. at 125-28 (testimony of H. Thomas McMeekin, Apr. 17, 2001).
36. The language of the advance notice deadline suggests that it was implemented in compliance with recently enacted SEC regulations imposed by Rule 14a-4,[3] which provides the circumstances under which a proxy may confer discretionary voting authority. See Ex. P-2A. Aside from the relationship between the advance notice provision and the SEC Rule, no explanation was given for the advance notice provision contained in the Fund's 1999 proxy statement.
37. At the April 11, 2000 meeting, the Board adopted a resolution which provided that "the Board of Directors will oppose the recommendations of Mr. Goldstein stated in his filed proxy materials." Ex. P-21 at 2 (Minutes of the LNV Board meeting held Apr. 11, 2000).
38. Plaintiff suggested that defendants adjourn the scheduled May 5, 2000 meeting for a short period to allow the defendants to respond to his nominations and proposal if they felt they needed more time. Defendants did not consider the possibility of adjourning the scheduled meeting. Tr. Transcript at 88-89 (testimony of Daniel R. Toll, Apr. 17, 2001); id. at *434 151 (testimony of H. Thomas McMeekin, Apr. 17, 2001).
39. On April 26, 2000, Goldstein was informed by letter from the Fund's counsel that LNV would provide him with the proxy solicitation information specified under Rule 14a-7 (see 17 C.F.R. § 240.14a-7), but that he "will not be entitled to raise any matters, including any director nominations, for consideration at the May 5 meeting." Ex. P-50 at 2 (letter from David Clarke to Goldstein and Ralph Bradshaw dated Apr. 26, 2000).
40. Also on April 26, 2000, the Fund filed supplemental proxy materials with the SEC, which included a letter dated April 24, 2000 from H. Thomas McMeekin to the shareholders of the Fund and a Supplemental Proxy Statement. The supplemental proxy material stated that plaintiff's nominations and Bylaw proposal "were received several months after the Fund's published deadline for receipt of shareholder proposals" and "will not be proper subjects for action at the Annual Meeting on May 5, 2000 and at any adjournments or postponements thereof...." Ex. P-8 at 6 (Definitive LNV Proxy Statement, filed Apr. 26, 2000).
41. The stated reason for the position taken by the Board that Goldstein's nominations and proposal were not proper subjects for consideration at the 2000 annual meeting was the advance notice deadline for shareholder proposals contained in the 1999 proxy material. See Ex. P-2A at LNV 0025; supra ¶ 12.
42. Goldstein first learned of the January 31, 2000 advance notice deadline contained in the 1999 proxy material "somewhere between ... March 31st and April 7th [2000]...." Tr. Transcript at 22 (testimony of Phillip Goldstein, Apr. 17, 2001).[4] He understood that advance notice deadline to refer to the date by which proposals had to be received by management under the guidelines set forth in Rule 14a-4. Id. at 166-67 (testimony of Phillip Goldstein, Apr. 16, 2001). It was his understanding that "management would have been able to exercise discretionary voting authority" for any proposals received after January 31, 2000. Id.
43. H. Thomas McMeekin and other Board members were concerned that Goldstein could win the election at the May 5, 2000 annual meeting. Tr. Transcript at 146-48 (testimony of H. Thomas McMeekin, Apr. 17, 2001); id. at 88 (testimony of Daniel R. Toll, Apr. 17, 2001).
44. By letter dated April 20, 2000, plaintiff asked the Board for permission to attend the May 5, 2000 meeting by telephone, as authorized by Maryland law. See Ex. P-39 (letter from Goldstein to H. Thomas McMeekin dated Apr. 26, 2000). In response, the Board informed plaintiff that he could attend by telephone, but that he would not be permitted to vote any proxies delivered to him by shareholders of the Fund. Tr. Transcript at 176-79 (testimony of Phillip Goldstein, Apr. 16, 2001); id. at 153 (testimony of H. Thomas McMeekin, Apr. 17, 2001) (testifying that *435 the Fund's counsel had told plaintiff he would not be allowed to present his nominations at the annual meeting).
45. Goldstein refused to attend the May 5, 2000 meeting because he did not want to be party to a "sham election" where he could not vote the proxies that he had solicited. Tr. Transcript at 179, 182 (testimony of Phillip Goldstein, Apr. 16, 2001); see also Ex. P-53 at A000051 (letter from Goldstein to David Clarke dated May 3, 2000) (stating that "[w]e believe it is important that the shareholders of the Fund have the opportunity to cast a fully informed vote. For the reasons stated, this cannot occur at the meeting on May 5 and we will not participate in a sham meeting.").
46. There was no quorum present at the May 5, 2000 meeting. Defendants adjourned the meeting in an effort to solicit additional proxies for the purpose of electing the Board's nominees. Ultimately, management received a majority of the proxies for the outstanding shares and its nominees for the Class I directors were elected.
47. Goldstein provided investment advice and money management services to family, friends and four clients  Opportunity Partners, Mercury Partners, LP ("Mercury Partners"), Calapasas Investment Partnership ("Calapasas"), and Jasso, Inc. ("Jasso"). Tr. Transcript at 115-22 (testimony of Phillip Goldstein, Apr. 16, 2001).
48. All of the persons or entities to whom plaintiff offered investment advice and money management services had different investment objectives and varying degrees of control of the funds in their brokerage accounts over which Goldstein had discretionary trading authority. Id.; id. at 53 (testimony of Glenn Goodstein, Apr. 18, 2001) (testifying that decisions as to which securities were bought and sold for Mercury Partners were made jointly by himself and Goldstein); id. at 65 (testimony of Jeff Robertson, Apr. 18, 2001) (testifying that he monitored all trades made on behalf of Calapasas by Goldstein).
49. Glenn Goodstein of Mercury Partners, Jeff Robertson of Calapasas, and Jaime Sohacheski of Jasso, all regularly discussed their investment strategies with Goldstein. They expected Goldstein to follow their advice on investing their funds. Id. at 55-56 (testimony of Glenn Goodstein, Apr. 18, 2001); id. at 66 (testimony of Jeff Robertson, Apr. 18, 2001); and id. 78-79 (testimony of Jaime Sohacheski, Apr. 18, 2001).
50. Goldstein has never commingled the funds that he manages for his clients. Id. at 123 (testimony of Phillip Goldstein, Apr. 16, 2001); id. at 53-54 (testimony of Glenn Goodstein, Apr. 18, 2001); id. at 67 (testimony of Jeff Robertson, Apr. 18, 2001); and id. 77-78 (testimony of Jaime Sohacheski, Apr. 18, 2001).

III. CONCLUSIONS OF LAW AND DISCUSSION
Plaintiff's Complaint alleges violations of the federal securities laws and the Maryland Corporations and Associations Code. Specifically, plaintiff avers that defendants (1) breached the fiduciary duty owed to plaintiff and all LNV shareholders by preventing plaintiff from nominating his candidates for election to the Board in violation of Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a) and Maryland law (Counts One and Four); (2) made misleading statements or omitted material facts in connection with the solicitation of proxies from shareholders in violation of the Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a-20 (Count Two); and (3) engaged in a joint transaction between the Fund and its directors in its effort to solicit proxies for the annual meeting at a cost of $130,000 *436 without prior approval of the expenditure from the SEC in violation of Section 17(d) of the Investment Company Act, 15 U.S.C. § 80a-17(d) (Count Five).[5] Jurisdiction is based on 28 U.S.C. §§ 1331 and 1367.
Defendants aver in their Counterclaim that Goldstein, his clients, family, friends and Opportunity Partners constituted an investment company within the meaning of the 1940 Act that unlawfully acquired more than 3% of LNV's outstanding shares in violation of Section 12(d)(1)(A)(i) of the 1940 Act, 15 U.S.C. § 80a-12(d)(1)(A)(i) (Counterclaim Count One).[6] Although plaintiff, his clients, family and friends no longer collectively own more than 3% of the Fund's shares, defendants contend because of the violation at the times at issue, plaintiff comes to this Court with unclean hands and is therefore not entitled to equitable relief. The Court will first address the issues relating to the reorganization of the Fund's Board of Directors and the claimed breach of fiduciary duty.

A. Breach of Fiduciary Duty
Plaintiff contends that the Board's actions constituted a breach of the directors' fiduciary duty in violation of Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a)[7] and Maryland law (Counts One and Four). Section 36(a) of the Investment Company Act imposes a federal standard for fiduciary obligations owed to shareholders by directors and other officers of mutual funds.[8] The fiduciary obligations required under Section 36(a) have been found to be "at least as stringent as those at common law."[9]Tannenbaum v. Zeller, 552 F.2d 402, 416 n. 10 (2d Cir.1977). By enacting Section 36(a), Congress intended to impose liability on mutual fund managers if "they engage in conduct which violates prevailing standards of fiduciary duty involving personal misconduct." Senate Report at 34, S. 3724, 90th Cong., 2d Sess., § 20 (July 1, 1968), quoted in Strougo v. Scudder, 964 F.Supp. 783, 799 (S.D.N.Y.1997). In light of Congress's *437 reliance on prevailing standards, and the fact that the parties did not brief the elements of a Section 36(a) claim, this Court does not reach the issue whether a breach of fiduciary duty claim arising under Section 36(a) (Count One) involves different elements than a breach of fiduciary duty claim arising under Maryland law (Count Four). Instead, the Court will decide the issues presented by Count Four under Maryland law but will not reach the similar issues presented in Count One under federal law.[10]
The Maryland Corporations and Associations Code provides: "A director shall perform his duties as a director ... (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." Md. Corps. & Assn's Code Ann. § 2-405.1(a). See Werbowsky v. Collomb, 362 Md. 581, 599, 766 A.2d 123, 133 (Md.2001) ("[D]irectors are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.").
This standard, commonly referred to as the business judgment rule, generally insulates decisions made by a corporation's board of directors from judicial review absent a showing that the corporate officers acted in bad faith. See Froelich v. Erickson, 96 F.Supp.2d 507, 520 (D.Md.2000); Black v. Fox Hills North Community Ass'n, Inc., 90 Md.App. 75, 81-82, 599 A.2d 1228, 1231 (Md. Spec.App.1992). Despite this deferential standard, a court may examine whether corporate directors "abided by the relevant ground rules" in making a decision. Mountain Manor Realty, Inc. v. Buccheri, 55 Md.App. 185, 194, 461 A.2d 45, 51 (Md. Spec.App.1983). In addition, "a court may intervene to prevent (or annul) conduct on the part of directors that is fraudulent or represents a breach of their fiduciary obligations," id., or violates the law. See Dennis J. Block, et al., The Business Judgment Rule: Fiduciary Duties of Corporate Directors 91 (5th ed. 1998) ("[A] decision by directors that a violation of law or fraudulent or ultra vires conduct would serve the best interests of the corporation is not protected by the business judgment rule.").
This case requires the Court to determine whether the defendants breached their fiduciary duty by violating the law when they precluded plaintiff's nominees and bylaw proposal; as part of that analysis, the Court must examine the actions of the Board in classifying the directors. First, the Court will turn to the question of whether or not the Board's actions are protected by the business judgment rule. Concluding that the Board's actions are not protected by the business judgment rule, the Court will then analyze the question of whether the board's actions constituted a breach of fiduciary duty that warrants equitable relief under the circumstances of this case.

1. Applicability of the Business Judgment Rule
As an initial matter, defendants argue that the directors' decision to stagger the Board was not a breach of fiduciary *438 duty as it is expressly authorized under Maryland law pursuant to Title 3, Subtitle 8 of the recently amended Maryland Corporations and Associations Code, which allows corporate directors to adopt a classified board and implement staggered elections. See Md. Corps. & Ass'ns Code §§ 3-802; 3-803(a)(1). Given the express statutory authorization for the Board's action, the Court concludes that LNV's Board acted within its statutory authority when it voted on March 13, 2000 to classify the Board and nominated candidates for the Class I positions it had just created.
Defendants also contend that the directors' decision to classify the Board is completely insulated from review by § 2-405.1(d) of the Maryland Corporations and Associations Code, which provides that "[t]he duty of the directors of a corporation does not require them to ... (3) Elect on behalf of the corporation to be subject to or refrain from electing on behalf of the corporation to be subject to any or all of the provisions of Title 3, Subtitle 8 of this article...." The Court disagrees with that argument. The text of the Maryland statute only precludes judicial review of a decision whether or not to adopt a staggered board  it does not insulate from review the method by which a board adopts a classified structure.
The decision of the Board to preclude plaintiff's nominees was based on what it referred to as an advance notice provision contained in the Fund's 1999 proxy materials. An advance notice provision is a deadline by which shareholder proposals or nominations must be received by a corporation in order for that proposal or nomination to be considered at the corporation's annual meeting.[11]
Defendants contend that the advance notice deadline contained in the Fund's 1999 proxy statement authorized their action; plaintiff asserts that the Board did not have the authority to preclude his nominees in the absence of a valid advance notice deadline contained in LNV's Bylaws or Charter. The Court concludes that the Board's preclusion of plaintiff's nominees for the Class I positions and his proposal was improper as the Fund had never adopted a valid, enforceable advance notice provision.
The question of whether the advance notice deadline contained in the Fund's 1999 proxy statement was legally sufficient raises a novel issue of Maryland law  namely, whether advance notice deadlines promulgated in a corporate document other than the corporation's bylaws or charter are enforceable. The Court concludes that they are not. Section 2-501(d) of the Maryland Corporations and Associations Code unequivocally states that "[e]xcept as this article provides otherwise, any business may be considered at an annual meeting without the purpose of the meeting having been specified in the notice." Section 2-504(e), effective June 1, 1999, carves out an exception to this broad mandate, providing that a company's "charter or bylaws may require any stockholder proposing a nominee for election as a director or any other matter for consideration at a meeting of the stockholders to provide advance notice of the nomination or proposal to the corporation...."
Where the highest court of a state has yet to address an issue of state law, *439 the federal courts "must predict how it would rule." New Castle County v. National Union Fire Ins. Co. of Pittsburgh, 243 F.3d 744, 749 (3d Cir.2001) (citations omitted). In predicting how the Maryland Court of Appeals will rule on the unsettled issues of state law presented in this case, the Court "consider[s] `relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" Siemens Medical Solutions Health Services Corp. v. Carmelengo, 2001 WL 389335, at *3 (E.D.Pa. Apr.12, 2001) (quoting Markel v. McIndoe, 59 F.3d 463, 473 n. 11 (3d Cir. 1995)).[12]
Prior to the enactment of § 2-504(e), which provides expressly that a corporation may, in its charter or bylaws, require shareholders to provide advance notice of nominations or proposals, Maryland law was silent on the issue. So as to eliminate any possible confusion as to the validity of advance notice provisions promulgated in a corporation charter or bylaw prior to the 1999 amendments to the code, the Maryland legislature specifically provided that the 1999 amendments did not invalidate any such previously enacted advance notice provisions as follows:
the changes made to § 2-504 of the Corporations and Associations Article by this Act may not be construed or interpreted to invalidate a provision contained in the charter or bylaws of a corporation before the effective date of this Act that allows a corporation to require a stockholder to provide advance notice of a nomination or proposal to the corporation before a meeting of the stockholders.
1999 Md. Laws ch. 300, § 4.
Section 2-504(e) specifically authorizes inclusion of advance notice requirements in a "charter or bylaws" after June 1, 1999. The Court interprets it to mean that, effective June 1, 1999, corporations could restrict shareholder proposals or nominations by including an advance notice provision in the corporation's charter or bylaws, but in no other way. The above quoted provision addresses the validity of such advance notice requirements before June 1, 1999 and makes it clear that only previously enacted advance notice requirements contained in the charter or bylaws of a corporation are valid.
Significantly, § 2-501(d) of the Maryland Corporations and Associations Code prescribes a policy to allow any business at annual meetings regardless of whether that business is specified in the notice;[13] any restrictions on this inclusive policy *440 must be as permitted by Maryland statute. In light of the broad scope of § 2-501(d) and the narrow language of § 2-504(e), the Court holds that, in order to be enforceable under Maryland law, an advance notice deadline for the submission of shareholder nominations or proposals must be contained in a corporation bylaw or charter. The Fund had no such advance notice provision. As a consequence, the Board breached its fiduciary duty to the shareholders as it did not have the authority to enforce the advance notice deadline contained in the Fund's 1999 proxy statement and unlawfully precluded plaintiff from bringing his business to the annual meeting of shareholders in violation of § 2-501(d). Thus, its decision to enforce the advance notice provision is not afforded the substantial protection of the business judgment rule as the Board's action violated the law.[14]See Mountain Manor Realty, Inc. v. Buccheri, 55 Md.App. 185, 194, 461 A.2d 45, 51 (Md.Spec.App.1983) (acknowledging the courts' authority to ensure that directors "abide[ ] by the relevant ground rules"); Dennis J. Block, et al., The Business Judgment Rule: Fiduciary Duties of Corporate Directors 91 (5th ed. 1998) ("[A] decision by directors that a violation of law ... would serve the best interests of the corporation is not protected by the business judgment rule.").

2. Equitable Relief
The Court has concluded that the business judgment rule is inapplicable to this case because the conduct of the Board was not authorized by law and breached its fiduciary duty to the shareholders. Since not all violations of law and breaches of fiduciary duty by a corporate board give rise to equitable relief, the Court must next address the issue of fairness to the shareholders and decide whether the conduct in this case warrants equitable relief. See generally, In re Croton River Club, Inc., 52 F.3d 41, 44 (2d Cir.1995) ("if the business judgment rule does not protect a board's decision, then the burden falls upon the board to demonstrate that its actions were reasonable and/or fair"); Emerald Partners v. Berlin, 726 A.2d 1215, 1221-22 (Del.1999) ("[A] breach of any one of the board of directors' triad of fiduciary duties, loyalty, good faith or due care, sufficiently rebuts the business judgment presumption and permits a challenge to the board's action under the entire fairness standard."); Dennis J. Block, et al., The Business Judgment Rule: Fiduciary Duties of Corporate Directors 28 (5th ed.1998) (observing that where the business judgment rule is found inapplicable, "the challenged conduct is reviewed by the court to determine whether the conduct is fair to the corporation and its shareholders, with the burden of proof resting upon the directors who approved the [action]").
Under the circumstances presented, the Court concludes that the directors' decision to preclude plaintiff's nominees and proposals was unfair to the shareholders.[15] As found supra, the Board did not *441 approve the advance notice requirement prior to the issuance of the 1999 proxy statement and had never discussed the possibility of restricting the shareholders' right to present proposals or nominations at the Fund's annual meeting. Despite this, when plaintiff attempted to nominate candidates and propose an amendment to the Bylaws, the directors relied on the advance notice provision contained in the prior year's proxy statement without discussing whether or not such a rule was appropriate or validly adopted. In addition, even though they had the clear authority to do so, the Board never considered the possibility of postponing the meeting in an effort to give the directors and shareholders time to consider plaintiff's proposals and nominees. These actions contravened plaintiff's right to participate in the electoral process in violation of his fundamental rights as a shareholder.
As observed by the Delaware Chancery Court in Linton v. Everett, 1997 WL 441189, at *9 (Del.Ch.1997), "[t]he right of shareholders to participate in the voting process includes the right to nominate an opposing slate." See also Hubbard v. Hollywood Park Realty Enterprises, 1991 WL 3151, at *11 (Del.Ch.1991) (recognizing the fundamental right of shareholders to vote and nominate candidates for the board of directors). Given the fundamental nature of shareholders' right to nominate and vote for directors, the Court concludes that the directors' decision to preclude plaintiff's nominees was unfair as they acted in the absence of any valid authority and thereby thwarted plaintiff's exercise of his rights as a shareholder.

3. Conclusion
In light of the actions of the Board, a shareholder of the Fund in plaintiff's position would be entitled to equitable relief. However, defendants contend that Goldstein should not be granted such relief because he comes to this Court with unclean hands. The Court next addresses that issue. Before doing so, the Court notes that plaintiff advanced a second argument regarding the staggered board issues. He argued that, separate and apart from the advance notice provision in the 1999 proxy statement, the Board inequitably interfered with the shareholder franchise and that the Board action should thus be set aside under Blasius Indus., Inc. v. Atlas Corp., 564 A.2d 651, 659 (Del.Ch.1988). The Court does not reach this alternative argument in view of its ruling with respect to the advance notice provision.

B. Unclean Hands
It is well settled that "[o]ne who comes into equity must come with clean hands and keep those hands clean throughout the pendency of the litigation. ..." Gaudiosi v. Mellon, 269 F.2d 873, 881 (3d Cir.1959). In applying the clean hands maxim, courts are primarily concerned with their own integrity and are given wide discretion in refusing equitable relief to the "unclean litigant." Id. at 881 n. 10 (citing Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)).
*442 Defendants contend that plaintiff comes to this Court with unclean hands and is therefore not entitled to equitable relief. Their argument is based on the Counterclaim in which defendants allege that plaintiff violated Section 12(d)(1)(A)(i) of the 1940 Act, 15 U.S.C. § 80a-12(d)(1)(A)(i), which prohibits an investment company from acquiring more than three percent of the outstanding voting stock of any registered investment company. Defendants contend that Goldstein, his clients, family and friends beneficially owned more than three percent of LNV and that this group (the "Goldstein Group") constitutes an investment company under the 1940 Act. Counterclaim ¶¶ 2 & 3.
Section 12(d)(1)(A)(i) of the 1940 Act applies to any investment company,[16] which is defined as "any issuer" that engages in specified activities. 15 U.S.C. § 80a-3. "Issuer" is defined in 15 U.S.C. § 80a-2(a)(22) as follows: "`Issuer' means every person who issues or proposes to issue any security, or has outstanding any security which it has issued."[17] Defendant contends that the Goldstein Group is or was an investment company that issues a security in the form of Goldstein's investment advice and his activities to influence management to close the discounts at which certain closed-end funds trade. The Court first turns to the threshold question of whether the Goldstein Group is or was an issuer of a security.
In SEC v. W.J. Howey, Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court held that the basic test for distinguishing a transaction involving a security from other commercial dealings is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." Howey, 328 U.S. at 301, 66 S.Ct. 1100. See also United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) ("The touchstone [of a security] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").
The Supreme Court concluded in Howey that the investment contracts at issue, which involved land sales contracts for tracts of an orange grove and service contracts, constituted a security because "[a] common enterprise managed by [others] with adequate personnel and equipment [was] essential [to the investment] if the investors [were] to achieve their paramount aim of a return on their investments." Id. at 300, 66 S.Ct. 1100. Based *443 on the Howey rationale, defendants allege that the success of the Goldstein Group's investments is dependent upon plaintiffs engagement in shareholder activism and his efforts to influence management to reduce or eliminate the discount at which closed-end funds trade.
The Court concludes that the Goldstein Group did not involve an investment of money in a common enterprise and that Goldstein's personal efforts to influence management to close or narrow the discount at which certain closed-end funds are traded were not expected to be the sole source of profits from the investments; thus, the Goldstein Group did not issue any type of security. Moreover, as found supra, the evidence at trial demonstrated that Goldstein rendered individualized investment advice and money management services to four clients-Opportunity Partners, the company that Goldstein jointly owns, Mercury Partners, Calapasas, and Jasso. Each of these clients has different investment objectives and varying degrees of control of the funds in the brokerage accounts over which Goldstein had discretionary trading authority. See supra Section II, ¶ 48. Glenn Goodstein of Mercury Partners, Jeff Robertson of Calapasas, and Jaime Sohacheski of Jasso, all testified that they regularly discussed investment strategies with Goldstein, and that they expected Goldstein to follow their advice on investing their funds. See supra Section II, ¶ 49.
Having determined that the Goldstein Group did not issue any sort of security, the Court further concludes that the group was not an "issuer" or an "investment company" within the meaning of the 1940 Act. Thus, neither Goldstein nor the Goldstein Group violated the Investment Company Act, and there is no issue of unclean hands.

C. Violations of Section 20(a) of the Investment Company Act
In Count Two, plaintiff alleges that defendants made misleading statements or omitted material facts in connection with the solicitation of proxies from shareholders in violation of Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a-20(a). The SEC rules[18] prohibit the use of proxy solicitation materials that are false or misleading or that omit to state facts material to a shareholder's determination. The Supreme Court has explained that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).
Defendants are correct in their assertion that they are not required to include in their proxy materials specific characterizations of the facts. See Bertoglio v. Texas Int'l Co., 488 F.Supp. 630, 660 (D.Del.1980). Defendants are required, however, to disclose information if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly *444 altered the `total mix' of information made available." TSC Indus., Inc., 426 U.S. at 449, 96 S.Ct. 2126. The total mix of information available includes information that is in the public domain, information known or reasonably available to the public, and information that is obvious. See Rodman v. Grant Foundation, 608 F.2d 64, 70 (2d Cir.1979); see generally T. Hazen, The Law of Securities Regulation § 11.4 at 315, quoted in Justin Indus., Inc. v. Choctaw Securities, 920 F.2d 262, 267 (5th Cir.1990) ("The materiality of an omission in a proxy statement is determined by taking into account all information in the public domain and facts reasonably available to the public to be used by shareholders in interpreting the information in the proxy sent to them.").

1. March 30 Proxy
As found supra, the initial LNV proxy solicitation filed March 30, 2000, stated that the Board had "implemented a staggered Board consisting of three Classes of Directors." Ex. P-4 at 5. The March 30 Proxy did not disclose that the directors' decision to classify the Board was implemented by the filing of Articles Supplementary to the Fund's Articles of Incorporation. See Ex. P-20 (LNV Articles Supplementary, filed Apr. 6, 2000). Plaintiff suggests that defendants should have disclosed in the March 30 Proxy that (1) the implementation of a classified board structure by charter amendment was pursuant to the "Extraordinary Action" article of the Maryland Corporations and Associations Code;[19] (2) the Board did not consider other methods by which it could have adopted a staggered board; and (3) the directors were concerned about plaintiff's request to be nominated to the Board. The Court concludes that the LNV Board was not required to disclose the title of the statutory provision under which it acted, its motives, or its concerns about Goldstein's nomination of himself to the Board. However, the Board should have disclosed the fact that the classified board was implemented by amending the Fund's Bylaws as there is a substantial likelihood that a reasonable investor would consider it important in deciding how to vote.
As observed by the Court of Appeals for the Fifth Circuit, "[c]hanges in the relative power of shareholder and director are fundamental to corporate governance." Justin Indus., Inc., 920 F.2d at 267. In Justin, the Fifth Circuit concluded that Justin Industries' management omitted material information from a proxy solicitation in failing to disclose a recently enacted bylaw amendment that required a super-majority vote by the shareholder in order to remove a director. Despite the fact that the directors ran unopposed in the election for which the proxies were solicited and that the bylaw was later repealed, the Justin court found that what was "important is not just how shareholders would have chosen to vote [had they been informed of the recent amendment], but also whether the disclosure might have influenced someone else to run." Id. at 266. Observing that Justin Industries' board, through the bylaw amendment and other actions, had signaled its resistance to any takeover, the court concluded that the average investor could well consider the bylaw changes material. Id. at 267.
*445 Similarly, it is likely that the average investor of LNV would consider an amendment to its Charter material. The restructuring of the Board in this case resulted in a significant change in the relative power of shareholders and directors. As discussed supra, the Board adopted a classified structure by charter amendment, which under Maryland law, may only be reversed by shareholder resolution that has been previously approved by the board of directors. Thus, the implementation of the classified board by charter amendment in this case can only be undone if the Board approves  something that the incumbent Board members are unlikely to do. Since reversing the Board's action might require the election of new directors, an average investor could reasonably consider the fact that the incumbent Board had just implemented a staggered board structure by charter amendment quite significant. This information could have influenced shareholders to nominate different candidates to the newly created Class I positions or otherwise impacted their vote.

2. April 24, 2000 Letter from McMeekin and Supplemental Proxy
With respect to the letter from H. Thomas McMeekin to the shareholders dated April 24, 2000 and LNV's Supplemental Proxy Statement filed April 26, 2000, plaintiff contends that (1) the Board's statements that plaintiff's proposals and nominations were received after the deadline and would thus be precluded from consideration at the annual meeting omitted material information; and (2) the April 24, 2000 letter was misleading when it stated that plaintiff's nominees "are known in the closed-end fund industry for their attempts to force funds to liquidate, convert to open-end funds, make significant repurchases of fund shares, conduct tender offers or convert to interval funds." Ex. P-8A (letter dated Apr. 24, 2000 from H. Thomas McMeekin sent to Fund's shareholders with the Fund's Supplemental Proxy Statement, filed Apr. 26, 2000).
The Court concludes the Board did not omit material information with respect to the statement that plaintiff's nominations and proposal "were received several months after the Fund's published deadline for receipt of shareholder proposals" and "will not be proper subjects for action at the annual meeting on May 5, 2000 and at any adjournments or postponement thereof...." Ex. P-8 at 6 (Definitive LNV Proxy Statement, filed Apr. 26, 2000). First, the Court notes that the "published deadline" was in the Fund's 1999 proxy statement, material that is readily available to the public. In addition, the Court concludes that the Board cannot be reasonably expected to state what it is not relying on, i.e., to state in its proxy materials that it is not relying on an advance notice provision contained in the Fund's Charter or Bylaws. Because the advance notice deadline was information already in the total mix of information available, the Court concludes that failing to identify the source of the "published deadline" is not a material omission.
Likewise, defendant H. Thomas McMeekin did not omit any material information from his letter to the shareholders dated April 24, 2000, in which he described Goldstein's nominees as individuals who "are known in the closed-end fund industry for their attempts to force funds to liquidate, convert to open-end funds, make significant repurchases of fund shares, conduct tender offers or convert to interval funds." Ex. P-8A (letter dated Apr. 24, 2000 from H. Thomas McMeekin sent to Fund's shareholders with the Fund's Supplemental Proxy Statement, filed Apr. 26, 2000). As discussed supra, the omission of obvious information is not material  it is obvious from its tone that the April 24, *446 2000 letter was campaign material. Additionally, it is obvious to any reasonable shareholder that one or two directors cannot "force" a corporation or fund to take any particular action. As such, the Court concludes that defendant H. Thomas McMeekin did not omit material information from his April 24, 2000 letter.

3. Conclusion
Having determined that the Board omitted material information from its March 30, 2000 proxy statement, the Court concludes that the 2000 election must be set aside and a new election ordered. See Justin Indus., Inc., 920 F.2d at 266 (observing that where misleading proxy disclosures result in the election of directors, a court may set aside the election for "`[i]f such an election were allowed to stand, the innocent stockholders would suffer the consequences of the violations and this the very group that the Securities Act of 1934 is designed to protect'") (quoting T. Hazen, The Law of Securities Regulation § 11.6 at 324); Bertoglio, 488 F.Supp. 630 (concluding that it is within the court's equitable powers to void the results of an election where there has been a violation of the proxy rules); cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (discussing the power of the courts to grant those equitable remedies "as are necessary to make effective the congressional purpose" of the securities laws) (internal quotation omitted).

D. Violations of Section 17(d) of the Investment Company Act
Finally, plaintiff contends that defendants unlawfully engaged in a joint transaction between the Fund, its directors and investment adviser, LIM, in its effort to solicit proxies for the 2000 annual meeting at a cost of $130,000 without prior approval of the expenditure from the SEC in violation of Section 17(d) of the Investment Company Act, 15 U.S.C. § 80a-17(d) (Count Five). Plaintiffs have asked for a declaration that the expenditures were unauthorized or an injunction prohibiting the expenditure of shareholder funds in excess of $10,000 in connection with the solicitation of proxies.[20]See Complaint ¶ 67.
The Court concludes that plaintiff presented insufficient evidence of a joint transaction to warrant the granting of declaratory relief and the issue of injunctive relief is moot because the money for the 2000 proxy solicitation has been spent. With respect to the remedy of disgorgement, the Court notes that the facts alleged could provide the basis for a claim against LIM, which is not a party. Goldstein's allegations and the evidence he presented do not provide any basis for disgorgement from the individual director defendants. Accordingly, the Court finds against plaintiff on this claim.

IV. CONCLUSION
Based on the foregoing analysis, the Court concludes that judgment will be entered in favor of plaintiff and against all defendants on Counts Two and Four of the Complaint and against plaintiff and in favor of defendants on Count Five of the Complaint. The Court declines to reach Count One of the Complaint as it is not necessary to the disposition of the case. Judgment will be entered in favor of plaintiff and against defendants on Count One of the Counterclaim. Count Three of plaintiff's Complaint, the allegations regarding an investment company set forth in Count One, ¶ 9 of the Counterclaim (see *447 supra note 6), and Count Two of the Counterclaim have been withdrawn. An appropriate order follows.

ORDER
AND NOW, this 27th day of April, 2001, following a non-jury trial in this case, for the reasons set forth in the attached Memorandum, the Court FINDS IN FAVOR of plaintiff, Phillip Goldstein, and against all defendants, Lincoln National Securities Fund, Inc., H. Thomas McMeekin, Adela Cepeda, Roger J. Deshaies, Richard Burridge, Thomas Mathers, Thomas L. Brindley, and Daniel R. Toll, on Counts Two and Four of the Complaint and on Count One of the Counterclaim. The Court FINDS IN FAVOR of all defendants, Lincoln National Securities Fund, Inc., H. Thomas McMeekin, Adela Cepeda, Roger J. Deshaies, Richard Burridge, Thomas Mathers, Thomas L. Brindley, and Daniel R. Toll, and against plaintiff, Phillip Goldstein, on Count Five of the Complaint. The Court declines to reach Count One of the Complaint as it is not necessary to the disposition of the case.
IT IS FURTHER ORDERED THAT:
1. Judgment is ENTERED in favor of plaintiff, Phillip Goldstein, and against all defendants, Lincoln National Securities Fund, Inc., H. Thomas McMeekin, Adela Cepeda, Roger J. Deshaies, Richard Burridge, Thomas Mathers, Thomas L. Brindley, and Daniel R. Toll, on Counts Two and Four of the Complaint and Count One of the Counterclaim;
2. Judgment is ENTERED in favor of all defendants, Lincoln National Securities Fund, Inc., H. Thomas McMeekin, Adela Cepeda, Roger J. Deshaies, Richard Burridge, Thomas Mathers, Thomas L. Brindley, and Daniel R. Toll, and against plaintiff, Phillip Goldstein, on Count Five of the Complaint;
3. The 2000 election of the Board of Directors of the Lincoln National Convertible Securities Fund is SET ASIDE and a new election shall be conducted in which both shareholders and management shall be permitted to nominate candidates to the Class I director positions;
4. By agreement of the parties, Count Three of plaintiff's Complaint, the allegations regarding an investment company set forth in Count One, ¶ 9 of the Counterclaim, and Count Two of defendants' Counterclaim are MARKED WITHDRAWN; and
5. Plaintiff's attorneys shall file and serve a motion for attorney's fees and costs within fourteen (14) days. Defendants' response to that motion shall be filed and served within fourteen days after service of the motion. Two copies of the motion and response shall be served on the Court (Chambers, Room 12613) when the originals are filed.
NOTES
[1] The Lincoln National Convertible Securities Fund is traded on the New York Stock Exchange as "LNV."
[2] The court in Strougo v. Scudder offered a succinct explanation of the difference between closed-end and open-end mutual funds as follows:

Unlike a traditional mutual fund in which investors purchase and redeem shares directly from and with the mutual fund, a closed-end fund has a fixed number of shares and (after the initial public offing) investors may only purchase shares from an existing shareholder through a stock exchange on which such shares are listed. Thus, shares in a closed-end fund are traded exactly like the shares of any other publicly-owned corporation. By contrast with an "open-end" mutual fund, in which the number of shares is not fixed and investors can purchase or redeem shares at current net asset value ("NAV") (calculated by dividing the fund's total assets by the number of shares outstanding), a closed-end fund has a fixed number of shares that originally were sold in a public offering. Per-share trading prices may be at either a premium or a discount to NAV, but more often are at a discount.
Strougo v. Scudder, 964 F.Supp. 783, 788 (S.D.N.Y.1997).
[3] See 17 C.F.R. § 240.14a-4(c) (providing that "[a] proxy may confer discretionary authority to vote ... (1) For an annual meeting of shareholders, if the registrant did not have notice of the matter at least 45 days before the date on which the registrant first mailed its proxy materials for the prior year's annual meeting of shareholders (or date specified by an advance notice provision)...."). See also SEC Release No. 34-40018, Amendments to Rules on Stockholder Proposals (May 21, 1998).

Notably, the 1999 proxy statement, which was issued just a few months after Rule 14a-4 was amended, was the first LNV proxy statement to include an advance notice deadline. Tr. Transcript at 182 (Apr. 17, 2001) (stipulating to fact that 1999 was the first year in which the Fund's proxy included a statement that shareholder proposals must be received by a certain date). See also id. at 16 (testimony of Adela Cepeda, Apr. 18, 2001) (testifying that the Board had never discussed the possibility of adopting an advance notice provision during her tenure on the Board, which began in 1992).
[4] Defendants argued at trial that Goldstein, in a letter dated April 14, 2000, acknowledged that he was aware of a provision of the 1999 proxy statement in January, 2000. See Ex. P-37 (letter from Goldstein to H. Thomas McMeekin dated Apr. 14, 2000) (writing that "[t]he Fund's proxy statement for 1999 states that `suggestions [for nominees] accompanied by biographical data will be considered [by the nominating committee] if sent to the Secretary of Fund.' In a letter dated January 22, 2000, I attempted to comply with that policy. ...").

That evidence, without more, does not establish that Goldstein was aware of the advance notice requirement contained in the 1999 proxy in the face of Goldstein's testimony that he did not become aware of the advance notice deadline until some time between March 31, 2000 and April 7, 2000.
[5] At trial, plaintiff stated that Count Three of the Complaint, which alleged that in 2000 defendants had refused to provide plaintiff a list of record owners of the Fund's stock or mail his proxy materials in violation of Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a-20, was now moot as the Fund agreed to mail his proxy materials for the 2001 annual meeting. Accordingly, Count Three was withdrawn.
[6] At trial, counsel for defendants withdrew Count Two of the Counterclaim and the allegations in Count One that a group comprised of "Goldstein, his clients, Opportunity Partners, the limited partners therein, Deep Discount, its investment advisory clients, Ron Olin, its investment advisory clients and Ralph Bradshaw" constituted an issuer and investment company that had acquired more than 3% of the Fund's shares in violation of the 1940 Act. See Counterclaim ¶ 9.
[7] The Investment Company Act has been construed by some courts as creating a private right of action. As this issue is not squarely presented by this case, the Court assumes, without deciding, that plaintiff may maintain a suit under 15 U.S.C. § 80a-35(a). See generally Strougo v. Scudder, 964 F.Supp. 783 (S.D.N.Y.1997).
[8] Section 36(a) of the Investment Company Act, 15 U.S.C. § 80a-35(a) provides, in pertinent part, as follows:

The Commission is authorized to bring an action in the proper district court of the United States ... alleging that a person serving or acting in one or more of the following capacities has engaged ... or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts  (1) as officer, director....
[9] At common law, a breach of fiduciary duty could be shown where corporate directors "have put their interests or the interests of another before the interests of the corporation." Strougo v. Scudder, 964 F.Supp. 783, 799 (S.D.N.Y.1997).
[10] Cf. Fields Eng'g & Equip. Inc. v. Cargill, Inc., 651 F.2d 589, 594 (8th Cir.1981) (holding that "it was unnecessary for the District Court to make a finding [under Federal Rule of Civil Procedure 52] on each of plaintiff's theories of recovery when its ultimate findings were dispositive of the issues"); Wright and Miller, Federal Practice and Procedure § 2579 (2d ed. 1995 & Supp.2001) (discussing district court's findings under Rule 52).
[11] See SEC Release No. 34-40018, Amendments to Rules on Stockholder Proposals at 28 n. 51 (May 21, 1998) ("An advance notice provision is a requirement in a company's charter or bylaws that a shareholder proponent notify the company of his/her intention to present a proposal a certain number of days or weeks prior to the shareholders' meeting or the mailing of proxies.").
[12] With respect to issues on which the Maryland courts have not spoken, this Court looks primarily to the state law of Delaware for guidance. In the area of corporate law, the Maryland Court of Appeals has noted the respect due Delaware decisions. See Werbowsky v. Collomb, 362 Md. 581, 618, 766 A.2d 123, 143 (Md.2001) (noting the respect "properly accorded Delaware decisions on corporate law"); see also Pittman v. American Metal Forming Corp., 336 Md. 517, 649 A.2d 356 (Md.1994) (looking to Delaware law in analyzing whether a sole shareholder had usurped corporate opportunity or breached fiduciary duty to the corporation); Dennis J. Block, et al., The Business Judgment Rule: Fiduciary Duties of Corporate Directors 3 (5th ed.1998) (observing that "the Delaware court system is often viewed as `the Mother Court of corporate law'") (quoting Kamen v. Kemper Fin. Servs., Inc., 908 F.2d 1338, 1343 (7th Cir.1990), rev'd on other grounds, 500 U.S. 90, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)).
[13] At trial, defendant Richard Burridge, a director of the Fund's Board, testified that it was his understanding that shareholders could have even made nominations for the director positions from the floor at the annual meeting. See Tr. Transcript at 31 (testimony of Richard M. Burridge, Apr. 18, 2001).
[14] Defendant argues that the Board implicitly amended the Bylaws in approving the advance notice deadline in the proxy statement. The evidence at trial, however, demonstrated that the Board did not consider the advance notice deadline prior to its inclusion in the 1999 proxy statement and did not pass the advance notice provision by Board resolution. In fact, several Board members testified that they were not aware of the deadline until the events that gave rise to this lawsuit began to unfold. See supra Section II, ¶¶ 35 & 36.
[15] Defendants argued at trial that plaintiff had not suffered any harm because the Board could have staggered itself shortly after the May 5, 2000 meeting, in which case plaintiff would have been in exactly the same position as at present  it would take him two elections to gain a majority on the Board. As set forth by defendants, if the Board had staggered itself after the May 5, 2000 meeting, the Class I directors' terms would expire at the annual meeting in 2001, Class II in 2002, and Class III in 2003; under those circumstances, it would take plaintiff two elections to elect a majority of the Board. Defendants argue that this is identical to plaintiff's current position as he could gain a majority within two elections  2001 and 2002  as the Fund's two Class II directors must stand for election in 2001 and the Fund's three Class III directors must stand for election in 2002. The Court rejects defendants' characterization of the injury in this case and concludes that the harm to plaintiff and the other shareholders resulted from the Board's enforcement of an invalid advance notice provision, not a delay in plaintiff's ability to obtain a Board majority.
[16] 15 U.S.C. § 80a-12(d)(1)(A) reads, in pertinent part, as follows:

It shall be unlawful for any registered investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any other investment company (the "acquired company"), and for any investment company (the "acquiring company") and any company or companies controlled by such acquiring company to purchase or otherwise acquire any security issued by any registered investment company (the "acquired company"), if the acquiring company and any company or companies controlled by it immediately after such purchase or acquisition own in the aggregate 
(i) more than 3 per centum of the total outstanding voting stock of the acquired company....
[17] The Securities Exchange Act of 1934 defines "security" as "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security...." 15 U.S.C. § 77b(a)(1).
[18] 17 C.F.R. § 240a.14a-9(a) provides as follows:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
[19] In support of his contention that this information is material, plaintiff points to the fact that defendants were required to disclose the amendment to the Fund's Articles of Incorporation under Rule 8b-16 of the 1940 Act. Rule 8b-16 requires investment companies to inform shareholders of "[a]ny changes in the company's charter or by-laws that would delay or prevent a change of control of the company ... that have not been approved by shareholders." 17 C.F.R. § 270.8b-16(b)(3). This rule requires that a company transmit such information "to shareholders in its annual report...." 17 C.F.R. § 270.8b-16(b).
[20] In the alternative, the parties at trial observed that the appropriate remedy for a Section 17(d) violation is disgorgement from the party who improperly benefitted from the unauthorized transaction.